(No. 71027.—▮▮▮▮▮)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. RONALD KITCHEN, Appellant.

*Opinion filed March 24, 1994.—Rehearing denied May 27, 1994.*

4

HARRISON, J., joined by FREEMAN, J., dissenting.

Charles M. Schiedel, Deputy Defender, and John J. Hanlon, Assistant Defender, of the Office of the State Appellate Defender, of Springfield, for appellant.

Roland W. Burris, Attorney General, of Springfield, and Jack O'Malley, State's Attorney, of Chicago (Terence M. Madsen, Assistant Attorney General, of Chicago, and Renee Goldfarb and William D. Carroll, Assistant State's Attorneys, of counsel), for the People.

CHIEF JUSTICE BILANDIC delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County, defendant, Ronald Kitchen, was convicted of five counts of murder. (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(a)(1).) After finding defendant eligible for the death penalty based on the statutory aggravating factor of murder of two or more individuals (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(3)), the same jury found insufficient mitigating factors to preclude imposition of the death sentence. Accordingly, the trial court sentenced defendant to death. Defendant's execution has been stayed (134 Ill. 2d R. 609(a)) pending direct appeal to this court (Ill. Const. 1970, art. VI, § 4(b); 134 Ill. 2d R. 603).

Codefendant Marvin Reeves was tried separately from defendant, and was also found guilty of five counts of murder (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(a)(1)) and five counts of aggravated arson. (Ill. Rev. Stat. 1985, ch. 38, par. 20—1.1(a)(2).) Codefendant Reeves was sentenced to natural life imprisonment. The present appeal involves only defendant's convictions and sentence.

## BACKGROUND FACTS

The evidence adduced at trial showed that during the early morning hours of July 27, 1988, the bodies of 26-year-old Deborah Sepulveda, her son Peter Jr., age three, and daughter Rebecca, age two; together with 30-year-old Rose Marie Rodriguez and her son Daniel, age three, were recovered following a fire in the Sepulveda residence located at 6028 South Campbell Street in Chicago. The bodies of Deborah Sepulveda and her two children were found in the front bedroom of the home. Deborah's naked body was found face down on the floor, and the bodies of Peter Jr. and Rebecca were found lying together holding hands on the bed. The bodies of Rose Marie and Daniel Rodriguez were found lying on the

bed in the rear bedroom. All five bodies were severely charred. There were no eyewitnesses to the murders.

The Chicago fire department responded to the call of a fire at 6028 South Campbell and extinguished the fire. Detective McInerney of the bomb and arson unit found a number of areas as origins of the fire: the front and rear bedroom mattresses, the top of the basement stairs, and a wall in the dining room. McInerney determined that the fires had been intentionally set using available materials and hand-ignited with an available flame, and had been smoldering and burning slowly for approximately three hours before they were extinguished.

Dr. Robert Stein, chief medical examiner for Cook County, performed the autopsies of the victims. Dr. Stein opined that Rose Marie died of manual strangulation based upon hemorrhage areas in the internal neck muscles, as well as a number of external abrasions and contusions to her neck. The cause of death of the other four victims was asphyxia due to suffocation. The absence of carbon monoxide in the victims' blood and lack of soot in the trachea revealed that all the victims were dead before their bodies were set on fire.

Detective Craig Cegielski of the Chicago police department investigated the premises immediately following the fire. In the basement, Cegielski found numerous small manila envelopes, approximately 1 by $1^1/_2$ inches, lying on a workbench. A large box containing the same type of envelopes was found next to the workbench. Cegielski testified that based upon his extensive experience, these types of envelopes are commonly used to package narcotics.

On August 8, 1988, Chicago Police Officer Frank Balzano of the canine unit performed a narcotics search in the Sepulvedas' home. The search dog indicated the presence or odor of narcotics in the rear bedroom and on a workbench located in the basement of the house.

Balzano also saw the box of small manila envelopes near the workbench; however, the envelopes were not inventoried by the police department or admitted into evidence. Search of the premises did not reveal any controlled substances.

Defendant and codefendant Marvin Reeves were implicated as the perpetrators of the multiple murders by Willie Williams, a long-time friend of both defendant and codefendant Reeves. Williams was an inmate at the Vandalia penitentiary. On August 1, 1988, Williams stated that he called defendant collect[1] from the prison. In that conversation, defendant told Williams that he and codefendant Reeves went "over to 60th and Campbell and killed Debbie and Mary because they owed them some money." Defendant told Williams that he smothered the children to death because he did not want to leave any witnesses to the murders. Defendant told Williams that he had set the fires that burned the victims' bodies to cover up the murders.

On August 5, 1988, Williams telephoned Detective John Smith of the Chicago police department and informed him of the substance of his conversation with defendant. Later that same day, Williams again spoke with defendant. During that conversation, defendant told Williams that he had killed "Debbie" and "Mary" and the kids, and that, if he had to, he would do it again. Defendant told Williams that he and codefendant Reeves had strangled "Mary" to death, but suffocated "Debbie" and the three children with a pillow. The women owed them $1,225 for drugs. Codefendant Reeves went into the trunk of the car and got some alcohol, and

---

[1]According to Williams, when he called defendant's house on August 1 and 5, he would call "collect." It was his belief that to call "collect" from prison meant to bill the call either to his girlfriend's or mother's telephone numbers.

defendant set the bodies on fire to cover up the details of the murders.

According to Williams, defendant and codefendant Reeves worked for a major drug supplier located on the south side of Chicago by delivering cocaine and collecting money. It was Williams' testimony that Rose Marie and Deborah purchased drugs on a regular basis from defendant and codefendant Reeves. Williams positively identified photographs of Rose Marie and Deborah as the women to whom cocaine was sold on numerous occasions. During the early months of 1988, Williams drove codefendant Reeves and defendant to the Sepulveda home at 6028 Campbell on approximately five different occasions to deliver cocaine and collect money.

On August 25, 1988, defendant was brought into the police station for questioning. Defendant made an oral statement to the detectives implicating himself and co-defendant Reeves in the multiple murders. Defendant later agreed to give a handwritten statement to the assistant State's Attorney. In the statement, defendant indicated that codefendant Reeves picked him up in front of his home around 11 p.m. on July 26, 1988, in a 1977 yellow Buick Regal, and asked whether he wanted to go for a ride to see a woman who owed him some money. Defendant agreed, and drove to the Sepulveda residence. Codefendant Reeves told defendant to wait, and walked up the stairs and knocked on the front door. Codefendant Reeves entered the house alone. The living room windows were open, and defendant heard a conversation between codefendant Reeves and a woman. After approximately five minutes, the conversation turned into an heated argument. Codefendant Reeves and the woman exchanged profanities.

At that time, defendant got out of the car and walked up to the porch and knocked on the front door.

Defendant entered the home, and saw codefendant Reeves go to the back bedroom and close the door behind him. Defendant heard punching and slapping noises, followed by the sound of a woman screaming and, finally, gasping for breath. Codefendant Reeves left the rear bedroom and told defendant that he wanted to leave. Both men walked out through the front door to the car.

Defendant saw codefendant Reeves take a plastic quart bottle out of the trunk and walk back into the house. Defendant noticed that all of the living room windows and the front door were now closed. Codefendant Reeves returned to the car and placed the bottle back into the trunk. As they drove off, codefendant Reeves laughed and told defendant that he thought he had "killed the bitch." Codefendant Reeves took defendant to buy a sandwich, and then drove him home. At the conclusion of the statement, defendant indicated that he had been treated well by both the police and the assistant State's Attorney. Defendant also indicated that he had given the statement voluntarily, and that no threats or promises had been made to him.

Chicago Police Officer Thomas Ptak testified that he searched the trunk of the 1977 Buick Regal belonging to codefendant Reeves. In the trunk of Reeve's car, Ptak found a plastic container containing a small amount of charcoal fluid, and an empty canister of gasoline hidden beneath a blanket. The parties stipulated that the gasoline can contained a residue of gasoline, and that the plastic container held flammable lighter fluid. It was also stipulated that no suitable fingerprints for comparison purposes could be found from either of these articles.

Around 6 p.m. on the evening of the murder, Victor Guajardo, Jr., who lived in the home next to the Sepulveda residence, saw a yellow, rusted, two-door, older model car parked in front of the Sepulveda home.

Guajardo positively identified the car parked in front of the Sepulveda residence as the one driven by codefendant Reeves.

Karen Williams, keeper of the company records for Illinois Bell, testified in defendant's case in chief. Based upon company telephone records, there were only two collect telephone calls made to the defendant's residence. Those calls were made on August 1, 1988, from Joliet, Illinois. However, Williams explained that if a calling party billed their call to a third-party billing number, the calling party's telephone number would not appear on the receiving party's telephone records.

Leslie Jenkins, defendant's sister, offered alibi testimony in defendant's behalf. Jenkins testified that on the night of the murders, defendant was at a "splash" party at the home of Irene Morrison located at 825 West 50th Place in Chicago. Although Jenkins was aware that her brother had been arrested on August 25, 1988, she did not tell anyone that he was with her on the night of the murders until two weeks prior to trial. Defendant also testified on his own behalf. Similar to Jenkins, defendant stated that on the evening of July 26, 1988, he attended a pool party with his son at Morrison's home. Defendant spent the night at the party, and did not return home until 9 a.m. the following day.

The State presented the testimony of several police officers in rebuttal. Detective Kill testified that on August 25, 1988, Eric Wilson, defendant's cousin, arrived at the police station. It was Kill's testimony that on August 1, 1988, codefendant Reeves told Wilson that he and defendant "had killed some people who lived on the other side of Western because they owed them some money." Wilson also told the detective that on August 16, 1988, he had a conversation with defendant on the front porch of his uncle's home. At one point, codefendant Reeves walked up and interrupted their conversa-

tion by saying: "I hope Willie [Williams] doesn't say anything. He is the only one that can get me in trouble over those people and knows what I did to them."

Officer Dowling testified that he was very familiar with the house located at 825 West 50th Place, and that he had also been there during July 1988. According to Dowling, there has never been a pool in the backyard of that home, or anywhere else in the 800 block of 50th Place.

In defendant's rebuttal case, Jenkins testified that she was mistaken as to the exact location of the pool party. Jenkins testified that the pool was located at 815 West 50th Place, instead of 825 West 50th. However, Morrison had since relocated the pool. Photographs were introduced to show the area where the pool was allegedly located. Three other witnesses who were acquainted with defendant and Jenkins corroborated her testimony that Morrison had moved the pool the previous year to her new residence.

Following trial, the jury returned a guilty verdict for the first degree murder of all five victims, but acquitted defendant of aggravated arson. The jury also found defendant eligible for the death penalty under the statutory aggravating factor of murder of two or more individuals. Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(3).

The jury heard the testimony of several witnesses at the sentencing phase of the trial, and found no mitigating factors sufficient to preclude the imposition of a death sentence. The judge sentenced defendant to death for the murder of the five victims.

## PRETRIAL ISSUES

Defendant contends that he was denied his right to equal protection under the fourteenth amendment when the State engaged in purposeful discrimination against him in violation of *Batson v. Kentucky* (1986), 476 U.S.

79, 90 L. Ed. 2d 69, 106 S. Ct. 1712. Defendant offers two challenges to the *Batson* procedure employed by the trial court. We first address defendant's contention that the State engaged in purposeful racial discrimination in the manner in which it exercised its peremptory challenges.

This case involved an interracial crime committed by an African-American defendant against five Hispanic victims. As a preliminary matter, the record shows that the venire was composed of 62 members, and that approximately 20 individuals were representative of minority groups. Three African-Americans and one Hispanic individual were seated on the jury. The State exercised a total of 12 of its 14 peremptory challenges, and six (50% of its peremptory challenges) were exercised against African-Americans.

The trial court made no finding that defendant demonstrated a *prima facie* case of purposeful racial discrimination under *Batson*. Nonetheless, the State volunteered its race-neutral explanation for the record after each strike of a black venireperson. Defendant correctly notes that the issue of whether defendant has made a *prima facie* showing becomes moot where the trial court fails to determine whether a *prima facie* case has been made, the State offers an explanation for the peremptory challenge, and the trial court rules on the ultimate question of intentional discrimination. (*Hernandez v. New York* (1991), 500 U.S. 352, 114 L. Ed. 2d 395, 111 S. Ct. 1859; *People v. Mitchell* (1992), 152 Ill. 2d 274, 288-90.) Thus, the issue we need address is whether the trial judge's findings were clearly erroneous.

In *Hernandez*, the Supreme Court established the following guiding principles to evaluate the race neutrality of an attorney's explanation. A court must determine whether, assuming the proffered reasons for the peremptory challenges are true, the challenges

violate the equal protection clause as a matter of law. (*Hernandez*, 500 U.S. at 359, 114 L. Ed. 2d at 406, 111 S. Ct. at 1866.) A neutral explanation is defined as an explanation based on something other than the race of the venireperson. (*Hernandez*, 500 U.S. at 360, 114 L. Ed. 2d at 406, 111 S. Ct. at 1866.) Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral (*Hernandez*, 500 U.S. at 360, 114 L. Ed. 2d at 406, 111 S. Ct. at 1866) and need not rise to the level of a challenge for cause. *Batson*, 476 U.S. at 97, 90 L. Ed. 2d at 88, 106 S. Ct. at 1723.

Once the prosecutor offers a race-neutral basis for his exercise of peremptory challenges, it is the trial court's duty to determine if the defendant has established purposeful discrimination. (*Batson*, 476 U.S. at 98, 90 L. Ed. 2d at 88-89, 106 S. Ct. at 1723-24.) Since the trial judge's finding constitutes a credibility determination, it should be given great deference (*Batson*, 476 U.S. at 98 n.21, 90 L. Ed. 2d at 89 n.21, 106 S. Ct. at 1724 n.21) and will not be overturned unless it is clearly erroneous (*Hernandez*, 500 U.S. at 369, 114 L. Ed. 2d at 412, 111 S. Ct. at 1871).

Defendant challenges the State's exercise of peremptory challenges against four African-American venire members. We address the State's proffered explanation for each excluded venire member in turn.

### Marie Shorter

Marie Shorter, a divorced mother of three adult children, worked for Quaker Oats as a computer operator for over 14 years. The State's explanation for removing Shorter was that the victim, Deborah Sepulveda, also worked for Quaker Oats. In its brief, the State argues that it did not want to have a juror who might have a negative view of the victim, thereby tainting the jury and preventing a fair trial.

Defendant contends, however, that the State failed to demonstrate the manner in which the fact that Shorter worked for the same corporation as the victim would prevent her from functioning as a fair and impartial juror. Specifically, defendant contends that the record is devoid of any factual information to show that Shorter and the victim knew each other. The trial judge afforded the State the opportunity to question the jurors during *voir dire*; however, the only question asked by the State was the length of time that Shorter had been employed by Quaker Oats.

The State concedes that Shorter did possess characteristics of a number of other venirepersons whom the State did not challenge and who ultimately sat on the jury. For example, Shorter had been the victim of a crime, and stated that she did not have any strong personal or religious beliefs that would prevent her from imposing the death penalty under appropriate circumstances. Said characteristics were also possessed by 5 of the 12 seated jurors and one alternate juror. However, the State maintains that the additional factor of Shorter's employment at the same corporation as the victim, Deborah Sepulveda, distinguished her from the other acceptable jurors.

Pursuant to *Batson*, it is the State's burden to "articulate" "a 'clear and reasonably specific' explanation" for its use of peremptory challenges against minority venirepersons. (*People v. Harris* (1989), 129 Ill. 2d 123, 181, citing *Batson*, 476 U.S. at 98 & n.20, 90 L. Ed. 2d at 88 & n.20, 106 S. Ct. at 1724 & n.20, quoting *Texas Department of Community Affairs v. Burdine* (1981), 450 U.S. 248, 258, 67 L. Ed. 2d 207, 218, 101 S. Ct. 1089, 1096.) As instructed by *Hernandez*, the State's rationale for exercising a peremptory challenge must be race neutral. In this case, the State's exclusion of juror Shorter does not demonstrate racial motivation. While

it is true that the State might have inquired further to establish a connection between Shorter and Deborah Sepulveda, it cannot be said that the proffered explanation was based upon the race of the juror or demonstrated a discriminatory intent. The trial court did not err in finding the State's reasons race neutral.

### Steven Gillenwater

Gillenwater, a 35-year-old married man, was employed as a social worker for pregnant teenagers at a Chicago area hospital. The State's explanation for the exclusion of Gillenwater was based not only upon his educational background as a social worker, but also because of his demeanor and his highly equivocal answers as to whether he could actually sign a verdict to impose the death penalty. Defendant argues that the State's reason for excluding Gillenwater based upon his employment as a social worker is inconsistent with the fact that other jurors who were seated possessed similar occupations.

Review of the record during the *voir dire* of Gillenwater reveals his level of discomfort with imposing the death penalty. Gillenwater stated that he was "pretty strongly opposed to the death penalty." Although he could put his feelings aside and base his decision on the evidence presented at trial, he indicated that he did not "like it, but there is not a heck of a lot I can do about it right now."

In resolving *Batson* claims, this court has consistently upheld prosecutor's challenges concerning the person's viewpoints toward the death penalty. (*People v. Howard* (1991), 147 Ill. 2d 103; *People v. Mack* (1989), 128 Ill. 2d 231.) We therefore find that the trial court correctly concluded that the State's reason for challenging Gillenwater on the basis of his viewpoint on capital punishment was legitimate and race neutral.

### Thelma Palmer

The State exercised a peremptory challenge against Palmer, a married woman with two children who worked as a hospital dietary clerk. The State excluded Palmer because according to her rap sheet, she had a previous arrest which she did not divulge during *voir dire*. Concealment of a prior criminal charge is a sufficient race-neutral reason for the State to exercise a peremptory challenge. *People v. Hudson* (1993), 157 Ill. 2d 401; *People v. Smith* (1992), 152 Ill. 2d 229.

### Harold Dickey

In its explanation of the exclusion of Harold Dickey, single, age 26, the State indicated that the peremptory challenge was based upon the fact that Dickey had never been employed. Additionally, Dickey was challenged because of his demeanor.

Unemployment is a sufficiently race-neutral reason for excluding a venireperson. (*People v. Hudson,* 157 Ill. 2d at 432; see also *People v. Smith* (1992), 236 Ill. App. 3d 812, 817; *People v. Lovelady* (1991), 221 Ill. App. 3d 829.) In addition, this court has held that the demeanor of a venireperson also constitutes a legitimate race-neutral reason for the exercise of a peremptory challenge. (*People v. Harris* (1989), 129 Ill. 2d 123, 176; *People v. Young* (1989), 128 Ill. 2d 1, 20.) Thus, we conclude that the trial judge's finding that the State advanced sufficiently race-neutral reasons to justify its challenge of Dickey was not clearly erroneous.

### Shannon Brooks

The State contended that it exercised a peremptory challenge against Brooks because she was unsure of her answers, and hesitated for a very long period of time before answering the questions posed to her. Moreover, she could not answer questions directly and concisely. Brooks worked as an administrative assistant at the State's Attorney's office in the civil division.

Subjective explanations such as those presented by the State must be closely scrutinized because they can be easily used by a prosecutor as a pretext for excluding persons on the basis of race. (*Harris*, 129 Ill. 2d at 176.) Nonetheless, the prosecutor's exclusion of a prospective juror on the basis of her demeanor has been held to be sufficient. (*Harris*, 129 Ill. 2d at 176; *Young*, 128 Ill. 2d at 20.) Upon careful review of the record, we note that a number of questions posed to Brooks had to be repeated before she could understand them. In light of the fact that the trial judge is in the best position to observe the demeanor of potential jurors and evaluate their explanations, and given the deference accorded the trial court's ruling, we decline to disturb his finding upon review.

For the foregoing reasons, we find that there is no evidence of discriminatory intent in the State's explanation for the exclusion of Shorter, Gillenwater, Palmer, Dickey and Brooks. Therefore, we find that the trial judge's finding that the State's explanation for the exercise of peremptory challenges against these jurors was valid and race neutral was not clearly erroneous. *Hernandez v. New York*, 500 U.S. at 369, 114 L. Ed. 2d at 412, 111 S. Ct. at 1871; *Andrews*, 155 Ill. 2d at 293-94; *Ramey*, 151 Ill. 2d at 519.

Defendant also contends that the trial court failed to apply the correct *Batson* standard, and instead erroneously applied the outdated "systematic exclusion" test announced in *Swain v. Alabama* (1965), 380 U.S. 202, 13 L. Ed. 2d 759, 85 S. Ct. 824. Previously, under *Swain*, a constitutional issue of equal protection could not arise unless there was a systematic and purposeful exclusion of blacks because of race from juries in case after case. (*Swain*, 380 U.S. at 223, 13 L. Ed. 2d at 774, 85 S. Ct. at 837.) The *Swain* test was later overruled and replaced by the standard articulated in *Batson*. Under *Batson*, a defendant's *prima facie* case of purposeful

racial discrimination in jury selection may be based solely on evidence regarding the State's use of peremptory challenges in the defendant's own case.

Defendant cites the following colloquy which purportedly demonstrates the trial judge's misplaced reliance upon the *Swain* standard.

"[DEFENSE COUNSEL]: Judge, I don't have the case citation.

I have read Supreme Court cases, Judge, even though there are some minority members on the jury, my recollection reflects only three minority members on the jury. But what was established was the State *systematically* excluding jurors, potential jurors, that in itself is reversible error.

[THE COURT]: It may be but what proof do you have to come forward with, what evidence do you have that the State *systematically sought* to challenge minority group persons?" (Emphasis added.)

It appears from the record that the trial judge was merely responding to the issue raised by defense counsel by repeating the same phrase that defense counsel used in his statement. Moreover, as previously noted, the trial judge assessed the State's explanation for the exercise of its peremptory challenges on an individual basis, and no reference was made to rulings made by the trial judge in previous cases. As such, we find defendant's argument that the trial judge improperly used the outdated *Swain* standard instead of the *Batson* test to be without merit.

## TRIAL ISSUES

Defendant initially contends that the State did not prove him guilty beyond a reasonable doubt. Defendant maintains that he was not sufficiently proven guilty because of the strongly corroborated alibi evidence; the testimony of the State's chief witness, Willie Williams, was highly improbable; the State's theory that the murders were the result of an unpaid drug debt is

incredible; the nonspecific and largely inaccurate detail in defendant's statement was not corroborated by Williams' testimony; and because of the absence of physical evidence linking defendant to the crimes.

The standard of review on a challenge to the sufficiency of the evidence is well-established:

> " ' "A criminal conviction will not be set aside on review unless the evidence is so improbable or unsatisfactory that there remains a reasonable doubt of the defendant's guilt." [Citations.] It is not the function of this court to retry a defendant when considering a challenge to the sufficiency of the evidence. [Citation.] Instead, determination of the weight to be given to witnesses' testimony, their credibility, and the reasonable inferences to be drawn from the evidence are the responsibility of the fact finder. [Citation.] On review:
>
>> " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' *** '[O]nce a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through the legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution.' (Emphasis in original.)" *Collins*, 106 Ill. 2d at 261, quoting *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789.' " *People v. Burrows* (1992), 148 Ill. 2d 196, 225, quoting *People v. Steidl* (1991), 142 Ill. 2d 204, 226.

Application of the aforementioned principles to the instant case leads to the conclusion that sufficient evidence was produced at trial to support the jury's verdict. As a preliminary matter, we note that defendant's alibi testimony was obviously inconsistent and contained fatal flaws. While defendant testified that he told Detective Kill that he was at a pool party on the night

of the murders, Detective Kill testified in rebuttal that defendant never made that statement to him at the time that he was first questioned regarding these offenses. In addition, defendant admitted that as Assistant State's Attorney Lukanich prepared the handwritten statement, he never mentioned to him that he was at the pool party. Leslie Jenkins, defendant's sister who offered alibi testimony on his behalf, admitted that she visited defendant in jail more than 10 times subsequent to his arrest. Yet she allowed defendant to languish in jail for two full years before contacting the authorities with personal knowledge that she was with him on the night of the murders.

The controverted testimony concerning the location of the party also diminishes the credibility of defendant's alibi. Defendant and Jenkins both initially testified that the pool party was located at 825 W. 50th Place. However, in the State's rebuttal case, Officer Dowling testified that a pool was never located at 825 W. 50th Place because the back yard was far too small to accommodate a pool, nor had a pool ever been located in the 800 block of 50th Place. Consequently, during defendant's rebuttal case, testimony was introduced to show that both defendant and Jenkins were mistaken as to the exact location of the party. However, the mere introduction of photographs showing pool lights and a fence surrounding the back yard does not, in itself, conclusively establish that defendant did in fact attend the alleged pool party on the night of the murders.

We also note that Irene Morrison, the purported owner of the home where the pool party was held, was not called by defendant as a testifying witness. Moreover, further inconsistencies exist in Jenkins' testimony concerning the details of the party itself. At first, Jenkins testified that she did not know anyone at the party; however, she later stated that she knew half the people

at the party. In view of the substantial inconsistencies apparent in defendant's alibi, we find that the jury's rejection of this defense was properly supported by the evidence.

Defendant next contends that Williams' testimony lacks credibility because of his prior convictions, and that his obvious motivation for giving false testimony implicating defendant was to secure an early release from prison.

The testimony offered by Williams provided the initial connection between defendant and codefendant Reeves and the adult victims through the cocaine transactions. The State produced other evidence to support its theory that defendant and codefendant Reeves murdered the women and their children over a drug debt. Williams testified that he had driven defendant and codefendant Reeves to deliver drugs and collect money from "Debbie" and "Mary" on a number of occasions, accurately described certain details of the Sepulveda residence, and positively identified photographs of Sepulveda and Rodriguez as the women to whom cocaine was sold. Chicago Police Officers Frank Balzano and Craig Cegielski found numerous small manila envelopes in the basement of the home which are commonly used to package narcotics, which supports the State's theory that the women were involved in drug trafficking. Rose Marie's aunt, Shirlee Garcia, testified that despite her limited income, Rose Marie was recently able to purchase a $57,000 home and car. In addition, shortly before her death, Rose Marie told Garcia that she had a friend who owed her $2,000.

The fire in the residence destroyed any physical evidence left by defendant and codefendant Reeves. Nonetheless, sufficient corroboration exists between defendant's statement and Williams' testimony. In his statement, defendant indicated that around 11 p.m., he

accompanied codefendant Reeves in the 1977 yellow Buick to the Sepulveda residence at 6028 S. Campbell to collect some money owed to him by a woman. Victor Guajardo, Jr., testified that he saw the yellow 1977 Buick parked in front of the Sepulveda residence around 6 p.m. on the night of the murders. This testimony supports the State's theory that codefendant Reeves first made a demand to the women for the money earlier in the evening. The autopsy report indicated that Rose Marie died of manual strangulation, which is corroborated by defendant's statement that following an altercation with codefendant Reeves, he heard the sound of a woman screaming and gasping for breath. The other victims were smothered to death, which is consistent with the placement of a pillow over their breathing passages resulting in asphyxia. Finally, the police search of codefendant Reeves' trunk yielded a plastic container holding charcoal fluid and an empty container of gasoline.

Given all of the evidence adduced at trial, and reviewing it in the light most favorable to the prosecution, we conclude that any rational trier of fact could have found defendant guilty beyond a reasonable doubt.

We next address defendant's argument that he was deprived of his sixth amendment right to effective assistance of counsel. Although defendant raises a number of ineffective assistance claims, at this point we address only the contention that trial counsel should have withdrawn from the case so that he could testify about defendant's physical condition following his arrest and written statement. Defendant does not claim on appeal that his oral and written confessions were not properly admitted into evidence.

Defendant asserts that the conflict of interest standard should be employed to determine whether defense counsel's failure to withdraw constitutes reversible

error. In *People v. Spreitzer* (1988), 123 Ill. 2d 1, this court held that a *per se* conflict of interest exists in instances where defense counsel had an association with the prosecution or victim, or with a person or entity who would benefit from the defendant's prosecution. Conflicts of interest, which have been categorized as denying the right to counsel *per se*, may warrant reversal without any showing that the attorney's performance was actually affected, unless the record reflects that the defendant was made aware of the conflict and knowingly waived his right to conflict-free counsel. *Spreitzer*, 123 Ill. 2d at 17.

A second class of conflicts exists where a defense attorney is involved in joint or multiple representation of codefendants. (*Cuyler v. Sullivan* (1980), 446 U.S. 335, 64 L. Ed. 2d 333, 100 S. Ct. 1708; *People v. Jones* (1988), 121 Ill. 2d 21; *Spreitzer*, 123 Ill. 2d at 17.) In those instances, where defense counsel brings the potential conflict to the attention of the trial court at an early stage, a trial court has a duty to either appoint new counsel or determine whether the conflict will be too remote to warrant new counsel. (*Holloway v. Arkansas* (1978), 435 U.S. 475, 484, 55 L. Ed. 2d 426, 434, 98 S. Ct. 1173, 1178; *Spreitzer*, 123 Ill. 2d at 18.) Reversal of a conviction under this rule does not require a showing that the attorney's actual performance was in any way affected by the purported conflict or a showing of "specific prejudice." (*Holloway*, 435 U.S. at 487, 55 L. Ed. 2d at 436, 98 S. Ct. at 1180.) However, if the trial court is not apprised of the potential conflict, then reversal of the conviction will only be had upon a showing that "an actual conflict of interest adversely affected" counsel's performance. *Cuyler*, 446 U.S. at 350, 64 L. Ed. 2d at 348, 100 S. Ct. at 1719.

We are not persuaded by defendant's argument that the *Holloway* standard is applicable to the factual cir-

cumstances in this case. Initially, we note the absence of a *per se* conflict of interest as defined above, for there is no indication that defense counsel was familiar with the prosecution, victim, or that he would have benefited from an unfavorable verdict. Nor is there evidence in the record that defense counsel ever informed the trial judge that a potential conflict of interest existed. Defendant contends, nonetheless, that it should have been apparent to the trial judge following the motion to suppress statements that trial counsel's testimony would be essential to defendant at trial.

At the motion to suppress statements, the State presented the testimony of four Chicago police officers, each of whom testified that defendant was not beaten and that his confession was voluntary. Assistant State's Attorney Mark Lukanich also testified that he did not see any of the police officers physically strike, threaten, or assault defendant. Most importantly, a videotape was presented at the suppression hearing which showed defendant's exit from the police station to the police wagon. In the videotape, defendant was walking normally and not limping in any manner, nor did he show any visible signs of injury.

Defendant testified on his own behalf that he was handcuffed to the wall; that the police officers repeatedly kicked and hit him during the time that he was interrogated; and that he also received blows to his head, chest, and groin. Eric Wilson, defendant's cousin, who was also detained by the police at the time that defendant was in custody, testified that he was kicked in the groin by a police officer. Wilson and codefendant Reeves both testified that they heard defendant scream in pain as he was being beaten by the police.

The trial judge denied defendant's motion to suppress, finding that the testimony of defendant, Wilson and codefendant Reeves was incredible and biased. We

reject defendant's unsupported contention that defense counsel's alleged testimony would have resulted in a different outcome. The record does not contain any sworn testimony, offer of proof, or motion supported by affidavit to establish what, if anything, defense counsel would have testified to at the suppression hearing or at trial. Moreover, as noted above, the State presented substantial testimony, including the videotape of defendant walking from the police station, which demonstrated defendant's physical appearance following his arrest and confession. We find, therefore, that it was not improper for the trial judge to have permitted defense counsel to proceed in his representation of defendant following the substantial evidence produced at the motion to suppress.

Alternatively, defendant argues that defense counsel should have recognized the conflict of interest that existed between his representation of defendant and the ethical provisions of Disciplinary Rules 5—101(b) and 5—102(a) of the Code of Professional Responsibility (the Code) (107 Ill. 2d R. 5—102(a)), which were in effect on the date defense counsel involved himself in the case. (By order dated February 8, 1990 the Code was repealed effective August 1, 1990, and was replaced by the Illinois Rules of Professional Conduct (134 Ill. 2d R. 1.1 *et seq.*).)

Rule 5—102(a) of the Code provides in pertinent part:

"If a lawyer learns after undertaking employment in contemplated or pending litigation or if it is obvious that he *** ought to be called as a witness on behalf of his client, he shall withdraw from the conduct of the trial and neither he nor his firm *** shall continue representation in the trial ***." 107 Ill. 2d R. 5—102(a).

Rule 5—101(b) states:

"A lawyer shall not accept employment in contemplated or pending litigation if he knows or if it is obvious that he *** ought to be called as a witness ***." 107 Ill. 2d R. 5—101(b).

Defendant argues that one of the critical issues in this case was the determination of whether defendant's confession and handwritten statement were the product of police beating and coercion. As stated, the State offered the testimony of four Chicago police officers to refute those allegations. Thus, defendant contends that it should have been perfectly "obvious" to defense counsel that his testimony was essential, for he would have been the only neutral, unbiased witness who could have testified concerning defendant's condition, and that such testimony would have supported the other defense witnesses and impeached the testifying police officers.

Defendant speculates that defense counsel could have testified that both defendant and Wilson told him that they had been beaten by the officers; defense counsel heard defendant moaning and screaming; and that defense counsel advised him to seek medical attention. Defendant also asserts that in closing arguments, as defense counsel offered his observations about the contested point of whether Wilson was handcuffed at the police station, defense counsel indicated that he would be "willing to take the stand and testify." However, the trial judge immediately ordered that those comments be stricken from the record as volunteered comments.

In this case, defendant has failed to show that, had his attorney testified, a reasonable probability existed that the outcome of the trial would have been different. (*Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052; *People v. Albanese* (1984), 104 Ill. 2d 504, 527.) The record does not establish what defense counsel's testimony would have been had he been called as a witness. Because the record does not adequately set forth what defense counsel's testimony would have been, we cannot resolve this ineffectiveness claim in defendant's favor. *Burrows,* 148 Ill. 2d at 248.

We next address defendant's argument that the State deliberately elicited prejudicial victim impact testimony from three surviving family members, including Deborah's sister and mother, and Rose Marie's aunt. Defendant maintains that it was unnecessary for the State to have asked these witnesses questions regarding the following: the burial arrangements and, in particular, the fact the children were buried in the same casket with their respective mothers; that Rose Marie's surviving son was now being raised by his "quite disabled" grandmother; the details as to how each witness learned about the fire and conveyed the news to other members of the family; that Deborah's mother rushed to the house and saw the bodies being carried out; the children's demeanor as "happy and normal" before their deaths; and that Deborah's mother went through the house following the fire and recovered her grandson's photograph.

In general, evidence regarding the impact of the victim's death on the victim's family is improper. However, a new trial is not required every time there is mention of a victim's family because in certain instances that statement may be harmless. (*People v. Del Vecchio* (1989), 129 Ill. 2d 265, 288; *People v. Simms* (1988), 121 Ill. 2d 259.) This court recognizes that a distinction exists between making the jury aware of the family left behind and cases where the prosecution has dwelt upon the deceased's family to the point that the jury would have related that evidence to the defendant's guilt. (*Del Vecchio*, 129 Ill. 2d at 288; *People v. Bernette* (1964), 30 Ill. 2d 359, 371.) Nonetheless, common sense tells us that murder victims do not live in a vacuum and that in most cases they leave behind family members. *People v. Free* (1983), 94 Ill. 2d 378.

Defendant acknowledges that his trial attorney failed to object to the testimony at trial and include this

issue in his post-trial motion. As such, this issue is waived. (*People v. Enoch* (1988), 122 Ill. 2d 176.) Nonetheless, defendant urges us to review this issue to determine whether it amounted to plain error. The plain error rule can be invoked in instances where the evidence is closely balanced, or where the error is of such magnitude that it deprived the defendant of a fair trial. *People v. Fields* (1990), 135 Ill. 2d 18, 60; *People v. Carlson* (1980), 79 Ill. 2d 564, 576-77.

Upon review of the record, we initially note that the comments complained of by defendant occurred only during the testimony of these witnesses, and were not mentioned by the State during opening or closing arguments, thereby distinguishing the instant case from others relied upon by defendant. (*Cf. People v. Hope* (1986), 116 Ill. 2d 265; *People v. Bernette* (1964), 30 Ill. 2d 359.) Moreover, viewed in its proper context, the remarks made by the testifying witnesses were admissible for the purpose of identification of the victims (see *Free*, 94 Ill. 2d 378, citing *People v. Brown* (1964), 30 Ill. 2d 297) or were incidental to other testimony. While it may have been irrelevant for the State to question the witnesses about the above-indicated matters, we do not find the testimony given so prejudicial as to deprive defendant of a fair trial, for the irrelevant information was not stressed or emphasized. (*People v. Pitsonbarger* (1990), 142 Ill. 2d 353.) Accordingly, it cannot be said that the victim impact testimony complained of by defendant constitutes plain error.

Defendant next assigns as reversible error the decision of the trial court to send to the jury six crime scene and 11 morgue photographs of the charred remains of the five victims. Whether or not a jury is allowed to see photographs of a decedent is a decision made by a trial judge in the exercise of his sound discretion. (*People v. Henderson* (1990), 142 Ill. 2d 258, 319; *People v. Nicholls*

(1969), 42 Ill. 2d 91.) Among the valid reasons for admitting photographs of a decedent is to prove the nature and extent of injuries and the force needed to inflict them, the position, condition, and location of the body, the manner and cause of death; and to aid in understanding the testimony of a pathologist or other witness. (*People v. Owens* (1976), 65 Ill. 2d 83, 90; *Nicholls*, 42 Ill. 2d at 99; *People v. Speck* (1968), 41 Ill. 2d 177, 203; *People v. Kolep* (1963), 29 Ill. 2d 116, 124.) If photographs are relevant to prove facts at issue, they are admissible and can be shown to the jury unless their nature is so prejudicial and so likely to inflame the jurors' passions that their probativeness is outweighed. See *People v. Foster* (1979), 76 Ill. 2d 365, 377-78; *People v. Lefler* (1967), 38 Ill. 2d 216, 221.

In this case, it was not an abuse of discretion for the trial judge to send 11 morgue and six crime scene photographs of the five victims to the jury. In view of the fact that defendant pled not guilty, the State is allowed to prove every element of the crime charged and every relevant fact. (*Henderson*, 142 Ill. 2d at 319.) The crime scene photographs were necessary to corroborate defendant's statement that Rose Marie was strangled in the rear bedroom of the home. Similarly, the crime scene photograph of Peter and Rebecca depicted the children lying on the bed holding hands in the burned remnants of their pajamas, and was corroborated by the testimony of Detective Cegielski as to the position and condition of the bodies following the fire. The morgue photographs corroborated Dr. Stein's explanation concerning the manner and cause of the victims' deaths, namely, that the victims died either by strangulation or suffocation, and were then set on fire. Moreover, we do not find the number of photographs shown to the jury to be excessive, as this case involved five victims.

In addition, defendant complains that in closing argument, the prosecutor held up a life photograph of each of the five victims followed by a death photograph, to illustrate "good" versus the "evil" allegedly perpetrated by defendant. However, this court has considered similar issues relating to the submission of life photographs to the jury, and has found such photographs admissible as part of the *corpus delicti* of the murder, as well as to corroborate testimony from a "life and death" witness. See *Smith*, 152 Ill. 2d 229; *People v. Morgan* (1991), 142 Ill. 2d 410, 461-62, *rev'd on other grounds* (1992), 504 U.S. 719, 119 L. Ed. 2d 492, 112 S. Ct. 2222.

Defendant further raises several arguments concerning improper questioning of defendant and other witnesses. Specifically, defendant claims that the State elicited testimony during direct examination from Officer Dowling that he was familiar with defendant through several contacts that he had with him over the years. During redirect examination, the trial court improperly allowed Willie Williams to testify that individuals on parole do not have their parole status violated when they commit misdemeanor offenses. Also, the prosecutor cross-examined defendant and one of his alibi witnesses concerning prior alias names and false addresses.

The State counters defendant's contention by arguing that defendant's failure to raise these issues in his written post-trial motion results in waiver of this issue upon review. (*Enoch*, 122 Ill. 2d at 190.) We agree. Defendant urges this court, nonetheless, to review these issues under the plain error rule. However, we do not find the evidence against defendant to be closely balanced, for the State produced overwhelming evidence to prove defendant guilty beyond a reasonable doubt. Additionally, we do not find the allegedly improper testimony so egregious as to deprive defendant of his right to a fair trial.

We next address defendant's argument that the State improperly cross-examined defense witness Lonnie Richardson about the "dope house" where Richardson allegedly resided. Richardson testified in defendant's rebuttal case that there was a portable swimming pool at the residence described by defendant and other witnesses in July 1988, which was later moved by its owner to another location. During cross-examination, the State attempted to impeach Richardson by asking him whether he lived in a "dope house" owned by the drug dealer for whom defendant allegedly worked, and if the police had been to his home on several occasions. The trial judge denied defense counsel's motion for a mistrial on the basis of this allegedly improper cross-examination.

In general, a witness may be cross-examined concerning those matters which would show the witness' bias, motive, or willingness to testify. (*People v. Thompkins* (1988), 121 Ill. 2d 401, 441.) Any permissible matter may be developed on cross-examination, since one of the purposes of cross-examination is to test the credibility of witnesses. (*Collins*, 106 Ill. 2d at 269; see *People v. Columbo* (1983), 118 Ill. App. 3d 882, 966; *People v. Mannen* (1977), 46 Ill. App. 3d 61, 64.) The latitude to be allowed on cross-examination and rebuttal is a matter within the sound discretion of the trial court, and a reviewing court should not interfere unless there has been a clear abuse of discretion resulting in manifest prejudice to the defendant. *Collins*, 106 Ill. 2d at 269; *People v. Peter* (1973), 55 Ill. 2d 443, 451-52.

We do not believe that the trial court abused its discretion in allowing the prosecution to make inquiries of Richardson to show that the house where he resided was owned by the drug dealer for whom defendant purportedly worked. The prosecution was attempting to show Richardson's bias and motive to testify favorably

on behalf of defendant. Moreover, Richardson's testimony concerning the pool party was merely cumulative to the testimony of five other witnesses on this point, and did not result in any substantial prejudice to defendant.

Defendant next makes several challenges to the remarks made by the prosecutor during closing arguments. He asserts that the prosecutor made comments designed to distort the evidence, alter the burden of proof, and improperly inflame the emotions and racial prejudices of the jury. The majority of the comments about which defendant now complains were not objected to at trial and therefore will not be considered by this court on appeal. (*Collins*, 106 Ill. 2d at 275.) We decline to review these comments under the plain error exception because the evidence of defendant's guilt was overwhelming.

In rebuttal closing argument, the prosecutor argued that the trial judge had previously ruled that defendant's handwritten statement to the police was admissible, thereby erroneously suggesting that the judge had found the statement to be factually reliable. The State maintains that the prosecutor's remarks were proper where defense counsel repeatedly insinuated during his closing argument that the statement had been obtained illegally, thereby inviting comment by the State on rebuttal.

It is well established that prosecutors are afforded wide latitude in closing argument, and improper remarks will not merit reversal unless they result in substantial prejudice to the defendant. (*People v. Pittman* (1982), 93 Ill. 2d 169, 176.) In reviewing allegations of prosecutorial misconduct, the closing arguments of both the State and the defendant must be examined in their entirety, and the complained-of remarks must be placed in their proper context. *People v. Cisweski* (1987),

118 Ill. 2d 163, 176, citing *People v. Nemke* (1970), 46 Ill. 2d 49, 59.

Defense counsel made several comments during closing argument attacking the credibility of the police officers and the assistant State's Attorney who took defendant's statement without providing defendant with his own lawyer, thereby violating defendant's constitutional rights. As such, it cannot be said that the comments now complained of were improper; rather, the prosecutor merely responded to remarks made during defendant's closing arguments. The prosecutor may respond to comments by defense counsel which clearly invite a response. (*People v. Williams* (1991), 147 Ill. 2d 173.) We therefore find defendant's claim concerning improper closing arguments to be without merit.

### JURY INSTRUCTIONS

As the instructions were read to the jury, the judge inadvertently stated that the jury should convict defendant of the murder of Peter Sepulveda if it found "any one" of two first degree murder elements to have been proved beyond a reasonable doubt. A similar misreading was made concerning the aggravated arson count for Rebecca Sepulveda, for which defendant was acquitted.

Defendant failed to properly preserve this issue for review. We find, nevertheless, that the judge's inadvertent misreading of the jury instructions for one of the victims was insignificant and harmless beyond a reasonable doubt, given the overwhelming evidence of defendant's guilt. A reviewing court must look to all the circumstances to determine whether defendant received a fair trial, "including all the instructions to the jury, the arguments of counsel, whether the weight of the evidence was overwhelming, and other relevant factors." (*Kentucky v. Whorton* (1979), 441 U.S. 786, 789, 60 L. Ed. 2d 640, 643, 99 S. Ct. 2088, 2090; *People v. Layhew* (1990), 139 Ill. 2d 476, 492.) We note that in this case the correct

written instructions for murder and aggravated arson were submitted to the jury for each victim. Moreover, the trial court informed the jury for the other four victims that they were required to find that *each one* of the propositions for murder was proved beyond a reasonable doubt before they could find defendant guilty.

In a related argument, defendant contends that the jury was instructed that one of the ways it could convict defendant of murder was by finding him guilty of felony murder based on aggravated arson. The jury acquitted defendant of all five aggravated arson counts, but convicted him of the five murders. Defendant argues, therefore, that because the murder convictions were returned in the form of a general verdict, there is no way to determine if defendant was convicted on a valid and proper ground.

We note that defendant failed to object at trial to the form of verdict used, nor was any objection included in defendant's post-trial motion. Therefore, in the absence of plain error, the issue is waived. See *Enoch*, 122 Ill. 2d 176; *People v. Jones* (1975), 60 Ill. 2d 300, 309.

As defendant's last challenge to the trial proceedings, he contends that he was denied effective assistance because his counsel failed to object to, or preserve in his post-trial motion, various alleged errors during jury selection, trial and sentencing. Defendant points out that these errors, in conjunction with the previously addressed claim that defense counsel should have withdrawn to testify as to defendant's injuries, combined to deprive him of his constitutional right to effective assistance of counsel.

In order to prevail under a claim of ineffective assistance of counsel, the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. (*Strickland*, 466 U.S. at 694, 80 L. Ed. 2d

at 698, 104 S. Ct. at 2068.) A reviewing court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Strickland*, 466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069.

As earlier discussed, defendant was unable to demonstrate that defense counsel's failure to withdraw to testify on his behalf was error given the substantial evidence produced by the State at the motion to suppress. Assuming, *arguendo*, that counsel's failure to interpose objections at various times at trial and sentencing did constitute error, when the overwhelming evidence supporting the verdict is considered, defendant clearly has failed to meet the burden of demonstrating a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different.

## SENTENCING ISSUES

Defendant first asserts that he was denied his right to a fair and impartial jury at capital sentencing because the trial judge excused for cause two potential jurors who did not show their inability to be impartial regarding the imposition of the death penalty. Defendant suggests that additional questions should have been posed to the jurors to fully ascertain their views on the death penalty.

*Carol Massel.* During *voir dire*, Massel stated that she had strong personal beliefs that would prevent her from imposing the death penalty in an appropriate case. Massel later equivocated, and indicated that, in certain circumstances, she thought she "would be biased where children were involved." However, during questioning by the State, Massel responded that she would not impose the death penalty.

*Charlie Mae Isom.* Based upon her religious and personal beliefs, Isom indicated that she did not "think" that she could impose the death penalty. Further, Isom

stated that regardless of what a person has done, she would not feel right in imposing a sentence of death.

Pursuant to *Witherspoon v. Illinois* (1968), 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770, the exclusion for cause of prospective jurors who express only general objections to the death penalty is prohibited. As stated, however, both Massel and Isom indicated that they did not think they could impose a death penalty based upon their personal beliefs. In similar situations, this court has held that such responses did not render the prospective juror's answer ambiguous. (See *People v. Gacho* (1988), 122 Ill. 2d 221, 240; *People v. Emerson* (1987), 122 Ill. 411, 431; *People v. Brisbon* (1985), 106 Ill. 2d 342, 357-60.) We find, therefore, that both jurors were properly excused for cause.

Defendant next contends that the prosecutor's closing arguments at the close of the capital sentencing hearing directed the jury's attention away from a proper consideration of defendant's mitigation evidence. In a related argument, defendant contends that the prosecution improperly argued that the legislature had determined that the death penalty was an appropriate penalty in the case at bar, thereby diminishing the jury's responsibility for imposing the death penalty. Defendant's supplemental brief maintains that the prosecutor improperly argued that defendant could not be "rehabilitated or restored to useful citizenship," which is inconsistent with the fact that, as a multiple murderer, defendant was ineligible to receive any sentence of less than natural life in prison.

Defendant failed to specifically include these alleged errors in his post-trial motion; as such, we find that the issues are waived. (*Enoch*, 122 Ill. 2d 176.) An exception to the waiver rule is provided by Rule 615(a) (134 Ill. 2d R. 615(a)), but that exception is expressly limited to cases in which the plain error affected substantial

rights. Decisions of this court have consistently noted that while the plain error doctrine may come into play when reviewing a sentencing hearing involving the death penalty (*People v. Szabo* (1983), 94 Ill. 2d 327, 355) issues which were waived will be addressed only when the evidence is closely balanced (*People v. Gacho* (1988), 122 Ill. 2d 221, 239; *People v. Garcia* (1983), 97 Ill. 2d 58, 86-87). In light of the overwhelming evidence of defendant's guilt, we decline to conduct a review of the alleged errors under Rule 615(a) (134 Ill. 2d R. 615(a)).

Defendant further argues that his sentence of death is disparate from the natural life sentence received by codefendant Reeves, who was convicted of five counts of aggravated arson in addition to murder. Defendant points to the following factors as evidence of the disparate sentencing: the prosecution vehemently argued to the judge at codefendant Reeves' trial and sentencing hearing that he was more culpable for this offense; codefendant Reeves was 29 years old on the date of these offenses, while defendant was only 22; codefendant Reeves drove his car to the Sepulveda residence and provided the fire accelerant; according to defendant's statement, he was merely an uninformed and uninvolved bystander to the actions committed by codefendant Reeves alone; and that codefendant Reeves was found eligible for a death sentence under more than one section of the statute.

This court's duty, under the United States and Illinois Constitutions, is to determine whether a death sentence has been imposed arbitrarily or capriciously, or is unduly severe considering the circumstances of the offense and the character and rehabilitative prospects of the defendant. *Pulley v. Harris* (1984), 465 U.S. 37, 79 L. Ed. 2d 29, 104 S. Ct. 871 (eighth amendment does not require comparative proportionality review if statute contains provisions that ensure rational, consistent, non-

44

arbitrary imposition of death penalty, such as a statute that narrows the types of cases in which the death penalty is an available sentence by requiring the existence of one or more statutory aggravating factors, that allows sentencer to consider mitigating evidence, and that provides for meaningful appellate review); *People v. Bean* (1990), 137 Ill. 2d 65, 134; *People v. Jimerson* (1989), 127 Ill. 2d 12, 54; *People v. Brownell* (1980), 79 Ill. 2d 508, 541-44; Ill. Const. 1970, art. I, § 11.

However, this court has previously considered whether a sentence of death in a particular case is disproportionately harsh in comparison with the less severe sanction imposed on a codefendant convicted of the same crime. See *Bean*, 137 Ill. 2d 65; *People v. Jackson* (1991), 145 Ill. 2d 43; *Jimerson*, 127 Ill. 2d at 54; *People v. Ashford* (1988), 121 Ill. 2d 55, 82-90; *People v. Erickson* (1987), 117 Ill. 2d 271, 302-03; *Szabo*, 94 Ill. 2d at 351-53; *People v. Gleckler* (1980), 82 Ill. 2d 145, 167-69, 171.

Our focus is on the particular defendant's extent of involvement in the offense, the nature of the offense, the character and background of the defendant, including any criminal record, and his potential for rehabilitation. (*Bean*, 137 Ill. 2d 65; *Free*, 94 Ill. 2d at 428, citing *Woodson v. North Carolina* (1976), 428 U.S. 280, 304, 49 L. Ed. 2d 944, 961, 96 S. Ct. 2978, 2991.) This focus guarantees the individualized sentencing required by the eighth amendment. (See *Lockett v. Ohio* (1978), 438 U.S. 586, 605, 57 L. Ed. 2d 973, 990, 98 S. Ct. 2954, 2965.) In sum, in reviewing the appropriateness of a death sentence, this court will examine the facts of that particular case and the evidence introduced at the trial and death penalty hearing, and, as a matter of reference, it may consider the sentence imposed on an accomplice or a codefendant in light of his involvement in the offense. *Bean*, 137 Ill. 2d at 135.

While defendant's statement attempted to shift the blame for the murders to codefendant Reeves, we are mindful of the fact that defendant twice admitted to Williams that he was personally involved in the murders. In his first conversation with Williams on August 1, 1988, defendant told Williams that he had smothered the children. He also indicated that he had set the fires to burn the bodies to cover up the murders. In the August 5, 1988, conversation, defendant again told Williams that he had killed "Debbie" and "Mary" and the kids, and if necessary, he would have committed the murders again.

Moreover, the cases in which this court has vacated the death sentence are factually distinguishable from the case *sub judice*. For instance, in *Carlson*, 79 Ill. 2d at 590, the defendant was sentenced to death for the murder of a police officer, which occurred as the defendant was attempting to avoid arrest for the murder of his former wife which he committed earlier on that same day. Focusing on the defendant and the circumstances of the particular offense, the court noted the absence of a criminal record. The court found that defendant was one "who would in all probability be leading a life acceptable to our society had not his unfortunate marital affair triggered this tragic sequence of events." In short, this court found mitigating circumstances which did not "bespeak a man with a malignant heart who must be permanently eliminated from society." *Carlson*, 79 Ill. 2d 564.

The same common thread runs through other cases in which this court has vacated the death penalty. In *Gleckler*, 82 Ill. 2d at 171, the defendant was sentenced to death for the murder of two teenage boys. The sentence was found to be excessive, in view of the fact that the defendant had "no criminal history, the personality of a doormat, and a problem with alcohol."

Similarly, in *People v. Buggs* (1989), 112 Ill. 2d 284, 294, this court found the death sentence an excessive punishment for a man convicted of the murder of his wife and child, who perished in a house fire set by the defendant after an argument with his wife. Relying upon the logic employed in *Carlson*, the court found that the defendant "would presumably be leading a life acceptable to our society" but for "this marital disharmony and a dispute which triggered this tragic sequence of events." *Buggs*, 112 Ill. 2d at 295.

Applying the principles developed in *Carlson, Gleckler* and *Buggs*, we find the extenuating circumstances which provoked the defendant's actions in those cases are not present here. Defendant took part in the brutal multiple murder of two women and their three small children, after which he set their bodies on fire. Defendant's argument that his death sentence should be vacated because his conduct was less culpable than that of his codefendant fares no better. As stated, defendant did admit to Williams that he smothered the children with the pillow, and that he lit their bodies on fire. Additionally, this court held in *Jimerson*, a case factually analogous to the instant case, that merely because "some or all of the members of [codefendant's] sentencing jury chose not to impose the death penalty in [codefendant's] case does not, in our view, render the defendant's own sentence disproportionate." *Jimerson*, 127 Ill. 2d at 54-55.

Defendant also claims that the trial court denied his eighth and fourteenth amendment rights by not affording him the right of allocution at the death penalty hearing. Defendant acknowledges that in *People v. Gaines* (1981), 88 Ill. 2d 342, this court held that a defendant in a death penalty hearing does not have the right of allocution. (See also *People v. Williams* (1983), 97 Ill. 2d 252, 303.) We decline defendant's invitation to

revisit this issue. Similarly, we choose not to reconsider the issue of whether a defendant is denied a fair sentencing hearing at the second stage of the death penalty hearing when the State was allowed to give opening-closing and rebuttal-closing arguments at the close of evidence, which this court previously addressed in *Williams*, 97 Ill. 2d at 302.

## CONSTITUTIONALITY OF THE ILLINOIS DEATH PENALTY

As a final matter, defendant raises several constitutional challenges to the death penalty statute. We see no reason to reexamine the following arguments: (1) the death penalty statute is unconstitutional because it does not sufficiently minimize the risk of arbitrarily or capriciously imposed death sentences (*Spreitzer*, 123 Ill. 2d at 44); and (2) the death penalty statute places a burden of proof on the defendant which precludes meaningful consideration of mitigation (*Bean*, 137 Ill. 2d at 138; *People v. Whitehead* (1987), 116 Ill. 2d 425, 465).

Defendant's last argument posits that based upon the Federal district court's decision in *United States ex rel. Free v. Peters* (N.D. Ill. 1992), 806 F. Supp. 705, the Illinois death penalty statute is unconstitutional because the jury instructions impose a presumption in favor of death, and that it is too vague. We note that this decision has been reversed by the Seventh Circuit Court of Appeals (*Free v. Peters* (1993), 12 F.3d 700). We find the reasoning in that decision sound, and therefore reject defendant's contention.

Accordingly, we find no merit to defendant's challenges to the constitutionality of the Illinois death penalty statute.

## CONCLUSION

For the reasons set forth above, we affirm defen-

dant's convictions and death sentence. We direct the clerk of this court to enter an order setting Wednesday, May 11, 1994, as the date on which the sentence of death, entered by the circuit court of Cook County, shall be carried out. Defendant shall be executed in the manner provided by law. (Ill. Rev. Stat. 1991, ch. 38, par. 119—5.) The clerk of this court shall send a certified copy of this mandate to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution where defendant is now confined.

*Affirmed.*

JUSTICE HARRISON, dissenting:

Defendant is entitled to a new trial under *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712, as the result of the State's decision to exclude Marie Shorter from the jury. The record shows that fewer than a third of the venirepersons were of the same race as defendant (African-American), yet half of the State's peremptory challenges were exercised against persons of African-American descent. Marie Shorter was one of those persons. As the majority points out, Shorter was excluded from the venire even though she shared characteristics, unrelated to race, which were common to 5 of the 12 seated jurors and one alternate juror.

At trial, there was no dispute as to whether defendant could establish a *prima facie* case of purposeful racial discrimination under *Batson*. Rather, the State proceeded directly to the next step in the *Batson* process, namely, to advance race-neutral explanations for the peremptory challenges it had made. In the case of Shorter, the State claimed that it had struck her from the venire only because she worked for the same company as Deborah Sepulveda, one of the five victims. The existence of a common employer was pertinent, according to the State, because the prosecution did not

want to have a juror "who might be familiar with Debbie Sepulveda in a negative manner, thereby tainting the jury and preventing a fair trial."

On its face, this explanation has nothing to do with Shorter's race. To this extent, the majority is quite correct that the State was able to proffer a race-neutral reason for Shorter's exclusion. Where the majority goes awry is in treating this as the end of the inquiry. Contrary to what the majority may believe, the mere assertion of a facially neutral reason for striking a juror cannot be sufficient to defeat a *Batson* challenge. If it were, the protections of *Batson* would be illusory, for facially neutral reasons are an easy thing for prosecutors to generate. (See *Batson*, 476 U.S. at 106, 90 L. Ed. 2d at 94, 106 S. Ct. at 1728 (Marshall, J., concurring).) To avoid this problem, the law makes clear that once a facially neutral explanation is proffered, the court still has a duty to consider the explanation and determine if the defendant has established purposeful discrimination. *People v. Andrews* (1993), 155 Ill. 2d 286, 293.

On such a review, the prosecutor's explanation must demonstrate that the excluded venire members exhibited a specific bias related to the particular case to be tried. (*Andrews*, 155 Ill. 2d at 293.) Moreover, the explanation must be legitimate (*Batson*, 476 U.S. at 98 nn. 20 & 22, 90 L. Ed. 2d at 88, 89 nn. 20 & 22, 106 S. Ct. at 1724 nn. 20 & 22) and not pretextual or contrived (see *People v. Gaston* (1993), 256 Ill. App. 3d 621, 624; *People v. Cannon* (1992), 227 Ill. App. 3d 551, 554; *People v. Lovelady* (1991), 221 Ill. App. 3d 829, 839).

The explanation offered by the State here does not meet this standard. As a preliminary matter, there is nothing in the record to substantiate the prosecution's claim that Shorter and the victim Sepulveda worked for the same employer. To the contrary, the evidence adduced at trial suggests that Sepulveda worked for

someone completely different. Even if the two women had worked for the same employer, however, the prosecution's professed concern over possible negative feelings about Sepulveda is belied by the fact that it made absolutely no inquiry into whether Shorter actually had any connection with her. The employer in question is a major United States corporation, and the prosecution made no attempt to ascertain whether Shorter worked in the same place as Sepulveda, knew her, or had even ever heard of her.

In addition, there is nothing to indicate why any familiarity, if it existed, might have left Shorter with negative feelings about Sepulveda. Sepulveda could well have been an exemplary co-worker with a positive reputation. During *voir dire*, the prosecution had no reason for assuming otherwise. The record shows simply that Sepulveda was Hispanic and that Shorter was African-American. The only way the prosecution could surmise the existence of ill feelings based on this limited information is by assuming that there is some inevitable hostility among co-workers of different races. This, however, is precisely the sort of racial stereotyping the law prohibits.

For the foregoing reasons, the fear of jury taint through negative familiarity had no legitimate basis, and the prosecutor's reasoning must be regarded as pretextual. (See *Gaston*, 256 Ill. App. 3d at 624.) The circuit court's decision to uphold the exclusion of Shorter against defendant's *Batson* challenge is therefore clearly erroneous, and the judgment must be reversed and the cause remanded for a new trial. Accordingly, I dissent.

JUSTICE FREEMAN joins in this dissent.