May 1, 1998

1-95-3677

THE PEOPLE OF THE STATE OF ILLINOIS, ) Appeal from the

) Circuit Court of

Plaintiff-Appellee, ) Cook County.

) 

v. ) 

)

HOMER CURRY, ) The Honorable

) David A. Erickson,

Defendant-Appellant. ) Judge Presiding.

JUSTICE HARTMAN delivered the opinion of the court:

A jury found defendant Homer Curry guilty of two counts of aggravated kidnapping, armed robbery, and aggravated battery.  Defendant appeals his convictions and concurrent 15-year sentences, raising as issues 
whether (1) the State proved the 
corpus delicti
 for aggravated kidnapping, armed robbery, and aggravated battery; (2) he was denied a fair trial where the circuit court failed to instruct the jury 
sua sponte
 as to the presumption of innocence and burden of proof; (3) imposition of his 15-year sentence was an abuse of discretion; and (4) the circuit court erred in entering judgment on both aggravated kidnapping counts and in sentencing him to 15-years' imprisonment for aggravated battery.

On March 14, 1994, defendant was arrested with nine other individuals and subsequently charged with the 
aggravated kidnapping, armed robbery, and aggravated battery of Rynalder Williams.  

The State presented the testimony of several police officers and introduced defendant's written statement, given to police after his arrest.  According to defendant's statement, on March 13, 1994, at 2:30 a.m., he and his friend, "Bobby," were driving in his uncle's Oldsmobile Toronado behind another vehicle containing three other men known to defendant, Darryl Banister, Brad Johnson, and Darnell Floyd.  Using walkie-talkies to communicate between the two automobiles, Banister pointed out a white Mercedes driven by Rynalder Williams and told defendant to follow it.  Although defendant had never seen Williams, he understood that he was following the Mercedes in order to rob Williams.  To that end, the men in the other car proceeded to Williams' home, while defendant followed the Mercedes to a club called the "Godfather," which Williams entered.  When Williams returned to his vehicle, defendant radioed the men waiting by Williams' garage and again followed the Mercedes.

As Williams drove into his garage, defendant and Johnson ran after him, while Banister and Floyd, armed with handguns, ordered him to lie on the floor.  Williams was then handcuffed, a cap was pulled over his head, and he was placed in the Toronado's trunk.  Taking both automobiles, defendant and the others then drove to Darren Streeter's house, where they brought Williams into the basement.

While in the basement, Streeter placed masking tape over Williams' eyes, covering the cap.  He also took $1800 from him in addition to several business cards, which defendant burned.  Streeter then struck Williams on his legs and head.

After moving Williams to the second floor of the house, defendant told him to call his cousin to ask for money.  Initially asking for $100,000, Banister lowered the demand to $40,000;  Williams' cousin was then told that if he did not provide the money he would never see Williams again.  Asking for more time, Williams' cousin promised to call back.  After several calls, it was agreed that the $40,000 would be brought to an Amoco gas station on Ashland Avenue in Chicago.

Defendant and Floyd followed in the Toronado, while Johnson and "Bobby" drove to the Amoco station.  Parking the Toronado, defendant exited and walked to Johnson's automobile; using Williams' cellular phone, defendant and Johnson spoke to Williams' cousin and told him to drop off the money.  Shortly thereafter, Williams' cousin dropped a bag at the station, which Johnson recovered.  Defendant then drove Johnson back to Streeter's house.

En route, defendant and Johnson discovered that the bag contained, not money, but scraps of paper.  Once back at the house, defendant telephoned Williams' cousin, asking him why he was "playing" with them.  Defendant then allowed Williams to speak with his cousin, but while on the phone, defendant struck Williams' upper knees with a baseball bat.  Shortly thereafter, defendant heard Williams scream and turned to see Streeter burning Williams' hand with an iron.  According to defendant, at this time, he had decided that, as soon as Williams' cousin called back, he would release Williams.  Before Williams could be unbound, however, the police arrived at the house.

Among the several police officers arriving at Streeter's house were Chicago Police Detectives John McMurray and Michael McDermott.  Testifying at trial, McMurray and McDermott explained how the investigation began.  On March 13, 1994, at 8 p.m., Williams' cousin, Adrian Bardo, entered a police station and spoke with Chicago Police Officer Louise Galvan.  After her conversation with Bardo, Galvan notified McMurray who, after gathering additional information from Bardo, asked him to use the telephone in the station to make several phone calls.  Once those calls were completed, preparations were made to follow Bardo, driving his own vehicle, to the gas station at Ashland Avenue and Van Buren Street in Chicago.  Prior to leaving, McMurray filled a paper bag with pieces of newspaper and gave Bardo a police radio.  In addition to McMurray and his partner, who drove together in an unmarked squad car, another unmarked squad car with two officers and an unmarked van containing three other police officers, including Detective Michael McDermott, followed Bardo to the gas station.

At the gas station, Detective McMurray observed a gold Honda parked in the station lot and an individual standing next to the Honda.  Within minutes, a Toronado drove into the station and parked next to the Honda.  McMurray then observed defendant exit the Toronado, walk to the Honda and enter the driver's seat of the Honda.  Bardo then drove into the station, tossed the paper bag out of his vehicle, and drove away.  The individual standing by the Honda picked up the paper bag, entered the Honda, and the Honda and the Toronado then left the station.

Detective McMurray, in his vehicle, joined Detective McDermott, in the van, in pursuit of the Toronado.  During the chase, McDermott observed a black automatic handgun thrown from the passenger side of the Toronado.  Unable to stop to recover the weapon, McDermott continued the pursuit, which reached speeds in excess of 100 m.p.h.  The vehicle chase ended when the occupants, Darnell Floyd and Derrell Adams, jumped from the Toronado and ran.  McDermott and his partner gave chase on foot and, after a three-block chase, caught both Floyd and Adams.  A search incident to arrest revealed that Floyd possessed a credit card belonging to Williams; and Adams held a large amount of cash.  Several of Williams' personal papers and a walkie-talkie were recovered from the Toronado.

After speaking with Adams and Floyd, Detectives McDermott, McMurray and other officers proceeded to 2029 W. Washburn in Chicago, where McMurray noticed the gold Honda parked in front of the house.  McMurray entered, went up to the second floor of the house, and observed defendant standing over Williams, attempting to remove his cap.  McMurray saw that Williams' hands were bound together with masking tape and tape was wrapped around both his neck and his eyes, holding the cap in place.  Telling defendant and Williams to lie on the floor, McMurray searched the room and recovered a baseball bat, an iron, a cellular phone and a pager.  Shortly thereafter, McMurray searched the Honda, finding a walkie-talkie and the paper bag containing newspaper.

Following the arrests of the occupants of 2029 W. Washburn, Detective McDermott, on March 15, 1994, proceeded to 33 East 119th Street in Chicago.  There, after knocking on the door and stating, "police," he heard running.  Searching the building, McDermott eventually discovered Darryl Banister, holding a loaded .25 caliber automatic weapon, crouched in the darkened basement.

The prosecution also presented testimony from Cherry Page, defendant's aunt and owner of the Oldsmobile Toronado, who  stated defendant had borrowed that vehicle on March 13, 1994.  Prior to resting, the prosecution introduced into evidence several photographs depicting injuries to Williams' knees, hand and head.

Defendant then presented the testimony of Samantha Benamon, who had been in Streeter's house on March 13, 1994.  According to Benamon, she had been awakened that morning by knocking, but did not see who had entered the house.  Sometime later, while she was in the room she rented, she heard the police enter the house, yell "freeze," and tell everyone to lie on the floor.  On the floor, Benamon was handcuffed to Williams, who neither complained nor asked for police assistance.  Although  testifying that she had not heard any unusual sounds that day, Benamon admitted that, on March 13, 1994, she told an officer that she had heard a disturbance or fight on the second floor.

On his own behalf, defendant testified that he had not kidnapped Williams, but instead had conspired with him and the others to extort money from Williams' family.  Defendant explained that on March 12, 1994, in the late evening, he was drinking with Adams, Banister, Johnson and Floyd.  After traveling to several different bars, defendant and Adams stopped at "The Godfather," where defendant met Williams for the first time.  Joined shortly by Banister, Floyd and Johnson, defendant and the others devised a plan whereby they first drove to Williams house and left his car in the garage.  From there, they traveled to Streeter's house, where they stayed in the basement for several hours, drinking and watching television.  To pay for food and alcohol, Williams gave Johnson and Adams his money.

According to defendant, it was Williams' idea to ask his family for the $40,000 ransom; sometime that evening, Williams volunteered to telephone his cousin Adrian Bardo for that purpose.  After several calls making arrangements, defendant and the others, without Williams, picked up the paper bag at the gas station.  Discovering that the bag contained no money, Johnson threw the bag away and, with defendant, returned to Streeter's house, where defendant spoke with Williams, trying to discover what had gone wrong.  It was then that the police arrived, ordered everyone to lie down and handcuffed defendant. 

According to defendant, at no time had Williams been tied up, struck, burned, or restrained.  He further stated that he gave a false statement implicating himself and the others to "cover" for Williams, expecting that Williams would do the same for him.  

Attempting to impeach the testifying officers, defendant also called Chicago Police Detective John Solecki, who testified that he had prepared an 18-page report of the incident after speaking with several witnesses and all the officers involved in the investigation.  Explaining that the report was a summary, he admitted that the report failed to indicate that Detective McMurray initially found defendant standing over the victim; rather, the report reflected that both defendant and Williams were lying facedown when police entered the second floor.

A jury found defendant guilty of two counts of aggravated kidnapping, armed robbery, and aggravated battery.  Denying defendant's motion for a new trial, the circuit court entered judgment on the findings and sentenced defendant to four concurrent 15-year sentences.  Defendant appeals. 

I 

Defendant initially contends that the State failed to prove the 
corpus delicti
 of each individual charge.

A conviction based upon a defendant's statement will be upheld where evidence corroborating the statement is admitted.  Corroboration may be satisfied by proof of the 
corpus delicti
.  
People v. Willingham
, 89 Ill. 2d 352, 359, 432 N.E.2d 861 (1982).  To prove the 
corpus delicti
, the State must establish both injury or loss and criminal agency.  
Willingham
, 89 Ill. 2d at 359. 
The State therefore must present evidence 
aliunde
 of a defendant's confession that tends to show the commission of the offense and is corroborative of the statement.  
People v. Furby
, 138 Ill. 2d 434, 446, 563 N.E.2d 421 (1990).  Once there is a showing of corroboration, however, the confession may be utilized in determining whether the 
corpus delicti
 has been proved.  
People v. Howard
, 147 Ill. 2d 103, 127, 588 N.E.2d 1044 (1991).  The other evidence, apart from the confession, need not prove the offense beyond a reasonable doubt or even correspond to the confession in every particular; rather, it need only tend to inspire belief in a defendant's confession or statement.  
Furby
, 138 Ill. 2d at 450-51.   Defendant's initial assertion that the State failed to present any independent or corroborating evidence that the crime of aggravated kidnapping occurred must be rejected where, as here, the record reveals ample evidence, apart from the confession, that the crime took place. 
 The independent evidence established that Williams' cousin entered the police station and, assisted by the detectives, made several phone calls and proceeded to an Amoco gas station with both a police radio and a "drop" bag.  At the gas station, defendant and his companion picked up the bag and drove away.  Shortly thereafter, Detective McMurray arrived at the house on Washburn and observed defendant standing over Williams, attempting to remove the cap that had been taped over Williams' eyes.  McMurray further noticed that Williams' hands were bound together with the tape.   

This evidence, coupled with the recovery of the walkie-talkies, tends to prove, consistent with defendant's statement, that defendant and his companions planned to rob Williams in his garage, moved him to the house on Washburn, and kept him there, bound and immobile, until the demanded ransom was paid.  See 
People v. Bounds
, 171 Ill. 2d 1, 45-46, 662 N.E.2d 1168 (1995).  Moreover, the State's evidence apart from the defendant's statement need not prove beyond a reasonable doubt that the offense occurred; rather, the evidence need only tend to show that the crime occurred.  
People v. Cloutier
, 156 Ill. 2d 483, 503, 622 N.E.2d 774 (1993).
 Likewise, it is unnecessary that the independent evidence disprove every possibility, other than kidnapping, that might have explained the circumstances of the ransom demand and Williams' confinement.  
People v. Montes
, 192 Ill. App. 3d 874, 881, 549 N.E.2d 700 (1989).  Here, the independent evidence, viewed in conjunction with defendant's statement, detailing the kidnapping plan, proved the 
corpus delicti 
of aggravated kidnapping.

II

In a similar vein, defendant asserts that the State failed to prove the 
corpus delicti
 of armed robbery.  Again, however, the evidence independent of defendant's statement tends to show that an armed robbery was committed.  Evidence was adduced that both Banister and Floyd possessed handguns; Banister, at the time of his arrest, and Floyd, just prior to arrest.  Moreover, when arrested, Floyd was found in possession of a large amount of cash and Adams had Williams' credit card.  Also, the Toronado in which they were riding contained several of Williams' personal papers.  This evidence, independent of defendant's confession, sufficiently corroborated the confession as to the armed robbery.  See 
People v. Bell
, 233 Ill. App. 3d 40, 49-50, 598 N.E.2d 256 (1992)
.  

In combination, the independent evidence and defendant's statement detailing how the men, using walkie-talkies to communicate, followed Williams, waited at his garage, held him at gunpoint, transported him to the house on Washburn, and took his cash and property, established the 
corpus delicti
 of armed robbery.

III

Defendant next asserts that the 
corpus delicti
 of aggravated battery was not proved, pointing to the lack of medical evidence regarding Williams' injuries and their cause.  Nevertheless, the independent evidence, namely, the photographs depicting the injuries to Williams' hand, head and knees, and the recovery of the iron used to burn his hand, tends to show that an aggravated battery occurred.  The photographs depicting the injuries, coupled with defendant's statement detailing how those injuries were inflicted with the iron, established the 
corpus delicti
 of aggravated battery.

IV

Defendant further contends that the State failed to prove him guilty of aggravated battery beyond a reasonable doubt. 

In the instant case, 
Williams was burned with an iron on his hand, resulting in a painful and obvious injury.  The jury heard how Williams screamed when burned and also viewed the photographs depicting Williams' injuries.  Defendant's argument must fail where, as here, the evidence, viewed in the light most favorable to the State, permits a rational jury to conclude that Williams suffered great bodily harm.  See 
People v. Kitchen
, 159 Ill. 2d 1, 636 N.E.2d 433 (1994).

V

Defendant next asserts that he was denied a fair trial when the circuit court failed 
sua sponte
 to instruct the jury as to the State's burden of proof and as to his presumption of innocence.  See Illinois Pattern Jury Instructions, Criminal, No. 2.03 (2d ed. 1981).

Generally, a party who desires a specific instruction must  offer it and request that the court tender it; the circuit court has no obligation to instruct on its own motion.  
People v. Layhew
, 139 Ill. 2d 476, 485-86, 564 N.E.2d 1232 (1990).  Nevertheless, in criminal cases, fundamental fairness concerns require a court to see that the jury is instructed on the elements of the crime charged, on the presumption of innocence and on the burden of proof.  
Layhew
, 139 Ill. 2d at 486.  Although error, a circuit court's failure to instruct as to burden of proof and presumption of innocence does not automatically result in a finding that defendant's constitutionally protected right to a fair trial has been violated.  
Layhew
, 139 Ill. 2d at 486.  A reviewing court must look to all the circumstances to determine whether defendant received a fair trial, "including all the instructions to the jury, the arguments of counsel, whether the weight of the evidence was overwhelming, and other relevant factors."  
Layhew
 139 Ill. 2d at 486, quoting 
Kentucky v. Whorton
, 441 U.S. 786, 789, 60 L. Ed. 2d 640, 99 S. Ct. 2088 (1979).

In the case 
sub judice
, the court did not tender, nor did defendant offer, an instruction as to the State's burden of proof or defendant's presumption of innocence.  Notwithstanding this fact, the jury was apprised fully of defendant's presumption of innocence and the State's burden of proof; defendant, therefore, was not denied his right to a fair trial.  First
, the circuit court, addressing the venire as a whole, emphasized that the complaint, although charging defendant with criminal acts, gave rise to "no inference of guilt and should not be taken as any inference of guilt against [defendant]."  The court emphasized the State's "burden of proving [defendant's] guilt during the trial beyond a reasonable doubt, and the burden always stays" with the State.  On numerous other occasions before the venire, the court reiterated that defendant was presumed innocent and need not present any evidence.  Likewise, the court, while questioning the venire, continually referred to the State's burden of proof beyond a reasonable doubt.

The potential impact resulting from the circuit court's failure to instruct the jury was further mitigated by the State's numerous references to its burden of proving defendant guilty of each offense beyond a reasonable doubt.  Referring to the elements of the individual offenses, the State repeatedly argued that it had proved each element, and thus defendant, guilty beyond a reasonable doubt.  Following the language of the soon-to-be tendered instructions, the assistant state's attorney also emphasized that the elements of each charge must be proved beyond a reasonable doubt.

The jury was expressly informed in other written instructions given by the court that defendant must be proved guilty beyond a reasonable doubt.  Each of the instructions defining the elements of the charged offenses provided that "to sustain the charge *** the State must prove" each of the elements "beyond a reasonable doubt."  The jury was sufficiently instructed as to the applicable law in the present case. 

VI 

Defendant next contends that the circuit court abused its discretion in sentencing him to a 15-year prison term.  Specifically, defendant maintains that his sentence was grossly disparate from that of his codefendant, Darren Streeter.

Mere disparity between a sentence given to a defendant convicted in a jury trial and another imposed upon a defendant who pled guilty, without more, does not mandate a reduction in sentence.  
People v. Banks
, 241 Ill. App. 3d 966, 984, 609 N.E.2d 864 (1993).  Nevertheless, a disparate sentence imposed upon a codefendant is justified only by a more serious criminal record or greater participation in the offense.  
People v. Milton
, 182 Ill. App. 3d 1082, 1093, 538 N.E.2d 1227 (1989).

In the instant case, defendant asserts that Streeter received a 10-year sentence in exchange for his plea of guilty despite the fact that he had three prior convictions.  The record, however, does not contain Streeter's criminal background, the charge to which he pled guilty, his pre-sentence investigation report, or any other relevant information to facilitate a comparison between defendant and Streeter.

 To prevail, defendant must demonstrate that he and the other codefendant were similarly situated with respect to background, prior criminal history, and potential for rehabilitation.  
People v. Cooper
, 239 Ill. App. 3d 336, 363, 606 N.E.2d 705 (1992).  Where a reviewing court is unaware of the factors upon which the sentencing court of a codefendant relied, it cannot determine whether or not the disparity is justified.  
Cooper
, 239 Ill. App. 3d at 363.  Defendant has not presented an adequate record to facilitate comparison and his argument must therefore fail.  See 
Milton
, 182 Ill. App. 3d at 1094.

VII

Defendant lastly argues, and the State concedes, that the circuit court erred in entering judgment on both aggravated kidnapping charges and in sentencing him to a 15-year sentence for aggravated battery.

Initially, one of defendant's convictions for aggravated kidnapping must be vacated; defendant committed one kidnapping and, therefore, cannot be guilty of, and sentenced to, two counts.  See 
People v. King
, 66 Ill. 2d 551, 363 N.E.2d 838 (1977); 
People v. Owens
, 109 Ill. App. 3d 1150, 441 N.E.2d 908 (1982).  Although defendant urges remandment for resentencing on the remaining charge, it is unnecessary in this case because the record reflects that the circuit court did not rely upon the second aggravated kidnapping conviction in sentencing defendant; instead, the court explicitly indicated that it was sentencing defendant on the Class X aggravated kidnapping charge (Ill. Rev. Stat. 1989, ch. 38, par. 10-2(a)(1)).  See 
People v. Burrage
, 269 Ill. App. 3d 67, 80, 645 N.E.2d 455 (1994).  Accordingly, the second charge of aggravated kidnapping (Ill. Rev. Stat. 1989, ch. 38, par. 10-2(a)(3)) is vacated.

Defendant's 15-year sentence for aggravated battery also must be vacated as beyond the permissible range for a Class 3 felony.  See 720 ILCS 5/12-4(e) (West 1994); 730 ILCS 5/5-8-1(a)(6) (West 1994).  Supreme Court Rule 615(b)(4) grants authority to reduce the punishment imposed upon a defendant by the circuit court.  134 Ill. 2d R. 615(b)(4).  Defendant's 15-year sentence is therefore reduced to five years, to be served concurrently with his 15-year sentence for aggravated kidnapping and armed robbery.  See 
People v. Muhammad
, 257 Ill. App. 3d 359, 629 N.E.2d 106 (1993).

For the foregoing reasons, defendant's convictions for aggravated battery, armed robbery and one count of aggravated kidnapping are affirmed; his second conviction for aggravated kidnapping is vacated; and his sentence for aggravated battery is reduced to five years.

Affirmed in part and vacated in part.

THEIS and HOURIHANE, JJ., concur.