2025 IL App (1st) 231936-U
Order filed: March 27, 2025

FIRST DISTRICT
FOURTH DIVISION

No. 1-23-1936

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 21 CR 7719 |
| | ) | |
| PATRICK WADE, | ) | Honorable Steven G. Watkins, |
| Defendant-Appellant. | ) | Judge, presiding. |

PRESIDING JUSTICE ROCHFORD delivered the judgment of the court.
Justices Hoffman and Lyle concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant's convictions for aggravated criminal sexual assault and aggravated kidnaping are affirmed, where defendant failed to show either that he was provided ineffective assistance of counsel or that one of his two convictions for aggravated kidnaping violated the one-act, one-crime doctrine.

¶ 2    Defendant-appellant, Patrick Wade, appeals from his convictions for aggravated criminal sexual assault and aggravated kidnaping, asserting on appeal that: (1) he was provided ineffective assistance of counsel with respect to providing a response to a jury question, and (2) one of his convictions for aggravated kidnaping must be vacated under the one-act, one-crime doctrine. For the following reasons, we affirm.

¶ 3 In April 2021, defendant was charged by indictment with six counts of aggravated criminal sexual assault and two counts of aggravated kidnaping, with all the charges arising from an incident involving the victim, J.T., allegedly occurring on or about June 3, 2018. The matter proceeded to a jury trial held in July 2023, on two counts each of aggravated criminal sexual assault and aggravated kidnaping.

¶ 4 At trial, J.T. testified that she was 18 years old, and that she and her family used to live in Chicago. On the evening of June 3, 2018, when J.T. was 13 years old, J.T. and her mother argued when her mother found J.T. using her phone when she was not supposed to be doing so. J.T.'s mother told J.T. to leave the home and go to her grandmother's house next door.

¶ 5 J.T. left the apartment, but did not go to her grandmother's house. J.T felt overwhelmed and wanted to take a walk, so she headed towards a nearby Save-A-Lot store because she knew people who worked there, and she thought it would help her clear her head. J.T. did not bring anything with her, and she was dressed in her pajamas. It was dark out at the time.

¶ 6 On the way to the store, J.T. encountered a man wearing a blue outfit. J.T. described the man as having brown skin, a larger body than her, and a boxy face. She thought he had brown eyes, but she was not sure. The man tried to speak with J.T. but she just kept walking. The man followed her, and J.T. turned and walk away from the man because she did not want to speak with him and she wanted to get away from him. J.T. went down an alley, heard footsteps behind her as she reached the end of the alley, and turned down another alley to head towards Save-A-Lot. She then saw that the man was following her.

¶ 7 The man caught up with J.T. and continued to speak to her, and he eventually took hold of J.T. with one arm on her back and the other grasping her neck and hair. J.T. told the man to leave her alone, but he continued to guide her down the alley until they reached a gangway with an open

gate next to a garage. J.T. testified that the man got more aggressive as they neared the garage, and that he then pushed J.T. through the gate into the gangway, knocking her over. J.T. landed with her knees on concrete, and the man pushed her back down again when she got up and tried to flee out the gate. The man got on top of J.T., covered J.T.'s mouth, and threatened to kill her when she started screaming for help.

¶ 8     The man first took off J.T.'s shorts and again threatened to kill her if she did not stop screaming. After he removed J.T.'s shorts, the man lifted her leg and put his penis into her anus. This hurt J.T., who continued to fight back. The man removed his penis from J.T.'s anus and then put it into her vagina, which also hurt J.T. She was still screaming for help, so the man put his hand over her mouth. The man moved his body in a "wave-like" form while he had his penis in her vagina.

¶ 9     J.T. continued screaming for help throughout the assault, and eventually someone called out from a window "what's going on?" Two or three minutes later a man came out into the alley speaking loudly on his phone. J.T. testified that the man who assaulted her stopped when he heard the man speaking loudly on the phone, and that he got up, pulled up his pants, and ran around the side of the house.

¶ 10    J.T. grabbed her shorts and put them back on, and then ran out into the alley towards the man speaking on the phone who was getting into his car. J.T. banged on his window and asked him for help because someone had just raped her. The man got out of his car and asked J.T. who had raped her. At this point, a person came out from behind the garage and said, "oh he ran that way," but J.T. recognized this person as the man who assaulted her, pointed at him, and said "that's him." The man then fled the scene and J.T. did not see him again. The police arrived on scene and

J.T. spoke with them. J.T. then got into an ambulance and went to the hospital. There, J.T. spoke with doctors and nurses.

¶ 11    J.T. further testified that she ran down the alley, but that the man caught up with her by the end. J.T. testified that the man did not drag her back into the alley, but just grabbed her back and hair, and then "shifted" her towards the gangway. The man's demeanor did not change until after she turned the corner in the alley and got to the gate next to the garage. At that point, he grabbed her and pushed her through the gate. The sexual assault took place in the gangway behind the gate, and lasted for several minutes.

¶ 12    Orlando Potts testified that he was living in a nearby building on June 3, 2018. Potts was in his room smoking marijuana out of an open window that overlooked the alley. Potts testified that his use of marijuana did not impair his ability to see or hear the events in the alley that evening. While smoking out the window, Potts saw a man and a girl walking down the alley. He could not see their faces, but said the girl was short and the man was tall. The man was holding the girl next to him while they walked. When the two reached the side of a garage, the man "yanked" the girl around the side of the garage where Potts could no longer see them.

¶ 13    After the pair disappeared around the side of the garage, he heard a scream and then a woman yell, "I can't breathe." Potts described the scream as "a scream you ain't going to forget." He shouted out the window, but he did not hear any response. The next thing that Potts observed was the man walking through the gangway pulling up his pants. The girl then came out into the alley screaming that she had been raped. The girl ran to a neighbor's house and Potts did not see anything after that. Potts spoke with a detective about the incident.

¶ 14    Dr. Moon Hee Hur, an assistant professor of pediatrics at the University of Chicago Comer Children's hospital, testified that she saw J.T. on June 3 and June 4, 2018, while she was working

as a pediatric resident in the emergency room. Dr. Hur met with J.T. in a private exam room. She first took J.T.'s medical history, during which Dr. Hur learned that J.T. had left her home after a fight with her mom. After leaving her home, a man followed J.T. J.T. ran away, but the man dragged her into an alley, put his hands over her mouth, and said he would kill her if she said anything. The man put his tongue in J.T.'s mouth, took off her shorts and put his penis in her anus and vagina, and put his mouth on J.T.'s breasts. The sexual assault continued for several minutes before someone yelled and the man ran away. J.T. was then able to get help from a neighbor.

¶ 15     Dr. Hur performed a physical and visual examination of J.T. and ordered basic blood work and other tests. Dr. Hur also performed a Sexual Assault Evidence Collection Kit on J.T. Through these examinations, Dr. Hur learned that J.T. had an abrasion on her right knee, a bruise on the entrance to her vagina, and an abrasion to the area between J.T.'s vagina and anus. Dr. Hur collected vaginal and anal swabs from J.T. while a nurse collected oral swabs. Based on her training and experience, Dr. Hur diagnosed J.T. with sexual assault of a child by bodily force by an unknown person, with injury due to physical assault, abdominal wall pain, and an abrasion of her right lower knee.

¶ 16     Detective Anthony Lewis testified that on June 3, 2018, he was assigned to investigate a sexual assault involving J.T. Lewis arranged for J.T. to undergo a specialized interview at the Children's Advocacy Center. He also had a sketch artist sit down with J.T. to prepare a sketch of the suspect. After this, Lewis waited for the results from the rape kit.

¶ 17     Lewis thereafter received a lab report from the Illinois State Police Crime Lab on May 15, 2020. The report led Lewis to identify defendant as a suspect in the case. Lewis arrested defendant on May 18, 2021. Lewis identified defendant in court as the man he arrested for sexually assaulting J.T. and testified that defendant was thirty-three years old at the time of the offense.

¶ 18    On cross-examination, Lewis testified Potts did not tell Lewis he saw a girl being dragged, but instead told him that the two were walking side by side. Potts also did not tell Lewis that he saw the man yank the girl behind the garage or that he saw a man walk out from behind the garage and zip up his pants.

¶ 19    Lewis further testified on cross-examination that his investigation was placed in a suspended status after he completed his investigatory steps, pending any results from the Illinois State Police Crime Lab. The sketch that Lewis had J.T. complete was put out in a community alert. The community alert resulted in several tips but none of them related to defendant. The investigation did not have any further developments until 2020, when the DNA results from the Illinois State Police lend him to defendant. After defendant was identified as a suspect, Lewis obtained his photo and put it into a photo array; J.T. identified a person other than defendant in that photo array.

¶ 20    DNA evidence presented at trial established that, while male DNA was detected in the vaginal and anal samples, neither sample was suitable for comparison. However, a DNA sample obtained from J.T.'s shorts was a match for defendant. Defendant was included as a contributor to the male profile identified in the non-sperm portion of the sample at a probability rate of 1 in 3.3 nonillion unrelated individuals. Defendant was included as a contributor to the male profile identified in the sperm portion at a probability rate of 1 in 700 nonillion unrelated individuals.

¶ 21    Following closing arguments, the court instructed the jury on the law. For the aggravated kidnaping charges, the court instructed the jury pursuant to Illinois Pattern Jury Instructions, Criminal, No. 8.05A (approved Dec. 8, 2011) (hereinafter IPI Criminal No. 8.05A). The instruction stated that the State was required to prove the following propositions:

"First Proposition: That the defendant acted knowingly; and

Second Proposition: That the defendant, by force or threat of imminent force, carried [J.T.] from one place to another place; and

Third Proposition: That when the defendant did so, he intended secretly to confine [J.T.] against her will; and

Fourth Proposition: That the defendant committed criminal sexual assault upon [J.T.]."

¶ 22    After receiving the instructions from the court, the jury retired to deliberate. Approximately 30 minutes after beginning deliberations, the jury sent a note to the court. The note asked: "Can the word 'carried' from the 2nd proposition be defined? What actions may be considered 'carried.' "

¶ 23    After reading the questions aloud to the parties, the court noted that "clearly [the jurors] are talking about the charge of aggravated kidnaping. . . . [T]he second proposition on each [of the aggravated kidnaping instructions] uses the language 'carry [J.T.] from one place to another place.' " The court stated: "I don't believe that there's a definition of the word 'carry' in the IPI criminal." The court further opined that the word "carried" is "a commonsense kind of word to me." Therefore, the court stated: "My thought is simply to inform them that you have been provided with all the necessary instructions." The State responded by requesting that the court tell the jurors "you have the evidence, you have the law, please keep deliberating." Defense counsel responded with: "Judge, we're in agreement with that." In accordance with the parties' request, the court responded to the jury's questions by writing: "You have evidence. You have the law in order to reach a verdict."

¶ 24    As the court tendered the response back to the deputy, the jury sent out an additional note. This note asked to review certain testimony and asked a question about some of the lab test results.

In response to the questions about obtaining the transcripts of testimony, the court responded: "Rely on your memory." In response to the question about the lab results, the court informed the jury: "You have the evidence. You have the law. Continue to deliberate."

¶ 25   At the conclusion of trial, the jury found defendant guilty of two counts each of aggravated criminal sexual assault and aggravated kidnaping. At a subsequent sentencing hearing, the court sentenced defendant to 15 years' imprisonment for each of the two aggravated criminal sexual assault convictions, and 10 years' imprisonment for each of the two aggravated kidnaping convictions. The sentences for the aggravated criminal sexual assault convictions were to run consecutively to one another, and consecutively to two concurrent sentences for the aggravated kidnaping convictions. Defendant subsequently filed a motion to reconsider, which was denied.

¶ 26   Defendant timely appealed, and in his initial briefs asserted only that he was provided ineffective assistance of counsel with respect to the response provided to the jury's question about the definition of "carried." This court thereafter granted defendant's motion to assert a second claim on appeal, and the parties thereafter filed supplemental briefs addressing defendant's additional, alternative claim that one of his convictions for aggravated kidnaping must be vacated under the one-act, one-crime doctrine.

¶ 27   We first address defendant's ineffective assistance of counsel claim. To assert a claim of ineffective assistance of counsel, a defendant must establish both that (1) "counsel's representation fell below an objective standard of reasonableness" and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984). "A defendant has the burden to satisfy both prongs of the *Strickland* test, and the failure to satisfy either of these prongs precludes a finding of ineffectiveness." *People v. Simpson*, 2015 IL 116512, ¶ 35. We conclude that even if

we assume that defendant could satisfy the first prong of the *Strickland* test, he has not established the second, prejudice prong.

¶ 28    As to the prejudice prong, our supreme court has recognized:

" 'In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently.' " [Citation.] Instead, *Strickland* asks whether it is 'reasonably likely' the result would have been different. [Citation.] A defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. [Citation.] A reasonable probability is a probability sufficient to undermine confidence in the outcome. [Citation.] *Strickland* requires a defendant to 'affirmatively prove' that prejudice resulted from counsel's errors." *People v. Lewis*, 2022 IL 126705, ¶ 46.

¶ 29    As our supreme court has also recognized:

"Generally, jurors are entitled to have their questions answered. [Citations.] When the jury asks a question on a point of law, when the original instructions are incomplete, or when the jurors are manifestly confused, the court has a duty to answer the question and clarify the issue in the minds of the jurors. [Citations.] Further, under certain circumstances, a circuit court has the duty to answer a jury's question even if the jury received proper instructions. [Citation.] When a jury makes explicit its difficulties, the court should resolve them with specificity and accuracy. [Citations.] The failure to answer or the giving of a response that provides no answer to the question of law posed has been held to be prejudicial error." *Id*. ¶ 58.

¶ 30    Here, the jury was provided with IPI Criminal No. 8.05A, which in relevant part required the jury to find: "That the defendant, by force or threat of imminent force, carried [J.T.] from one place to another place." As the parties acknowledged below and again on appeal, the pattern jury instructions themselves do not provide a definition of the word "carried." Rather, in support of his contention that he was prejudiced by the failure to provide a definition of "carried," defendant relies upon the definition utilized by the appellate court in *People v. Casiano*, 212 Ill. App. 3d 680, 687 (1991). Specifically, defendant notes that in *Casiano*, the court cited to the dictionary to conclude that "the word 'carry' itself not only means to move while supporting a load, but also to 'escort, lead, guide,' 'convey,' or 'take.' " *Id*. (citing Webster's Third New International Dictionary 343 (1981)). Defendant essentially contends that there is a reasonable probability that, if this definition had been provided to the jury, the result of his trial would have been different. We disagree.

¶ 31    Indeed, had the jury been provided with such a definition, it would have been specifically informed that the requirement that it find that defendant carried J.T. from one place to another could be satisfied by evidence that defendant escorted, led, guided, conveyed or took J.T. from one place to another before the sexual assault. Such a definition matches the evidence in this case. J.T. testified that defendant took her by the back and neck and then forced her out of the alley and into a gangway out of site, where he proceeded to rape her. J.T. specifically testified that defendant "guided" her through the alley, physically "shifted" her toward him, and then "pushed" her from the alley to the gangway. This evidence was corroborated by Potts' eyewitness testimony that he saw defendant and J.T. walking with defendant's arms on her "like a couple" before he "yanked" her out of sight behind a garage. If anything, providing such a definition would have made it even *more likely* that the jury would have convicted defendant of aggravated kidnaping. As such, we

conclude that defendant has failed to affirmatively prove prejudice and therefore his claim of ineffective assistance of counsel must be rejected. *Simpson*, 2015 IL 116512, ¶ 35.

¶ 32     In reaching this conclusion, we reject defendant's reliance upon several other cases in support of his assertion of prejudice resulting from the failure of his trial counsel to provide a different response to a jury question. While defendant cites to *People v. Landwer*, 279 Ill. App. 3d 306 (1996), *People v. Childs*, 159 Ill. 2d 217 (1994), *People v. Oden*, 261 Ill. App. 3d 41 (1994), *People v. Kamide*, 254 Ill. App. 3d 67 (1993), and *People v. Brouder*, 168 Ill. App. 3d 938 (1988), none of these cases involved an assertion of ineffective assistance of counsel requiring a defendant to " 'affirmatively prove' that prejudice resulted from counsel's errors.' " *Lewis*, 2022 IL 126705, ¶ 46. Nor do we find persuasive defendant's reliance on *Lewis*, 2022 IL 126705, ¶¶ 71, 85, as in that case the court specifically concluded that "defense counsel's acquiescence and failure to challenge the court's answers to the jury's questions was one of multiple errors that substantiates defendant's ineffective assistance of counsel claim" and that the "cumulative effect of defense counsel's three errors established his deficient performance." No such cumulative error is even alleged in this case. Finally, while defendant is correct that prejudice resulting from counsel's failure to offer a clarifying definition in response to a jury's question was found in both *People v. Sperry*, 2020 IL App (2d) 180296, ¶¶ 14-18, and *People v. Coots*, 2012 IL App (2d) 100592, ¶ 54, in each case this was only after defendant identified a specific IPI definitional instruction that should have been provided and demonstrated specific prejudice resulting from the failure to provide that definition. That is not the situation presented here.

¶ 33     We now turn to defendant's contention that one of his convictions for aggravated kidnaping must be vacated under the one-act, one-crime doctrine. The application of the one-act, one-crime rule is a question of law that is reviewed *de novo*. *People v. Johnson*, 237 Ill. 2d 81, 97 (2010).

¶ 34    As an initial matter, we note that defendant never raised this argument in the trial court. However, we will nevertheless consider this argument, as "a violation of the one-act, one-crime doctrine affects the integrity of the judicial process, thus satisfying the second prong of the plain-error analysis." *People v. Span*, 2011 IL App (1st) 083037, ¶ 81.

¶ 35    In *People v. King*, 66 Ill.2d 551, 566 (1977), our supreme court set forth what has come to be known as the one-act, one-crime doctrine. As originally formulated, that doctrine concerned the potential for prejudice in the imposition of multiple convictions, and specifically provided:

> "Prejudice results to the defendant only in those instances where more than one offense is carved from the same physical act. Prejudice, with regard to multiple acts, exists only when the defendant is convicted of more than one offense, some of which are, by definition, lesser included offenses. Multiple convictions and concurrent sentences should be permitted in all other cases where a defendant has committed several acts, despite the interrelationship of those acts. 'Act,' when used in this sense, is intended to mean any overt or outward manifestation which will support a different offense. We hold, therefore, that when more than one offense arises from a series of incidental or closely related acts and the offenses are not, by definition, lesser included offenses, convictions with concurrent sentences can be entered." *Id*.

¶ 36    As our supreme court has more recently noted:

> "Decisions following *King* have explained that the one-act, one-crime doctrine involves a two-step analysis. [Citation.] First, the court must determine whether the defendant's conduct involved multiple acts or a single act. Multiple convictions are improper if they are based on precisely the same physical act. Second, if the conduct involved multiple acts, the court must determine whether any of the offenses are lesser-

included offenses. If an offense is a lesser-included offense, multiple convictions are improper." *People v. Miller*, 238 Ill.2d 161, 165 (2010).

¶ 37    Here, defendant solely argues that his two convictions for aggravated kidnaping violate the first step of the one-act, one-crime analysis as they were purportedly based on precisely the same physical act. We must therefore determine the number of acts at issue here. If we conclude that the conduct underlying defendant's convictions for aggravated kidnaping comprised a single physical act, defendant could not properly be convicted of the two offenses for that single act. *Id.*

¶ 38    For purposes of the first-step analysis, an "act" has been defined as any overt or outward manifestation that will support a different offense. *King*, 66 Ill.2d at 566. Our supreme court has "explained a defendant could be convicted of two offenses when a common act is part of both offenses. 'As long as there are multiple acts as defined in *King*, their interrelationship does not preclude multiple convictions * * *.' (Emphasis omitted.)" *People v. Price*, 2011 IL App (4th) 100311, ¶ 26 (quoting *People v. Rodriguez*, 169 Ill.2d 183, 189 (1996)).

¶ 39    As relevant here, a "person commits the offense of kidnapping when he or she knowingly *** by force or threat of imminent force carries another from one place to another with intent secretly to confine that other person against his or her will." 720 ILCS 5/10-1(a)(2) (West 2018). In turn, and as also relevant here, a "person commits the offense of aggravated kidnaping when he or she commits kidnapping and *** inflicts great bodily harm, other than by the discharge of a firearm, or commits another felony upon his or her victim." 720 ILCS 5/10-2(a)(3) (West 2018). The predicate other felonies here were the two alleged instances of criminal sexual assault.

¶ 40    Specifically, Count 7 and Count 8 each alleged that defendant committed aggravated kidnaping by committing the offense of kidnapping and committed another felony on his victim during the kidnapping. Count 7 alleged the defendant, by force or the threat of force, carried J.T.

from one place to another with the intent to secretly confine her and committed criminal sexual assault against her by making contact between his penis and J.T.'s vagina. Count 8 alleged the defendant, by force or the threat of force, carried J.T. from one place to another with the intent to secretly confine her and committed criminal sexual assault against her by making contact between his penis and J.T.'s anus. Thus, to obtain defendant's convictions, the State was required to prove not only that a kidnapping occurred, but also that during the kidnapping, defendant committed two different and separate acts of sexual contact. Each of those acts of sexual contact were separate physical acts. Even though defendant's asportation or carrying of J.T. and his anal and vaginal contact of her all occurred in close proximity in time and were thus interrelated, those acts were all separate and they do not become a singular act simply by virtue of when the acts occurred.

¶ 41      Thus, we agree with defendant that there was a single kidnapping, and that single kidnapping was a common act forming part of both offenses of aggravated kidnaping. However, we do not agree that this single common act results in a one-act, one crime violation with respect to his two convictions for aggravated kidnaping. Again, as charged here, both aggravated kidnaping charges required the State to prove, in addition, that defendant committed yet another felony upon J.T. 720 ILCS 5/10-2(a)(3) (West 2018). The State did so here, presenting evidence of two, separate instances of criminal sexual assault occurring during the kidnapping.

¶ 42      In reaching this conclusion, we again reject defendant's reliance upon several other cases. On appeal, defendant cites to *People v. Turner*, 128 Ill. 2d 540, 577 (1989), however, in that case the court accepted the defendant's argument that his "convictions for unlawful restraint and kidnapping cannot stand because they are lesser included offenses of aggravated kidnapping." As discussed above, here defendant makes no such second-step argument. Moreover, while the court in *Turner* did state generally that in that case "[t]here was one ongoing event and it is sufficient to

sustain a charge of aggravated kidnapping," it did so in the context of addressing that second-stage argument. *Id.* The *Turner* decision did not consider the issue presented here, in which there were two, separate predicate felonies underlying two, separate charges of aggravated kidnaping. The same is true for defendant's reliance upon *People v. Kittle*, 140 Ill. App. 3d 951, 957 (1986) ("As we conclude that unlawful restraint was a lesser included offense of kidnapping and that both the confinement and the detainment were closely related acts, under *People v. King* *** the conviction for unlawful restraint should be vacated."). We also reject defendant's reliance upon *People v. Curry*, 296 Ill. App. 3d 559, 569 (1998). The decision in that case was based upon the State's concession that one of two aggravated kidnaping convictions must be vacated and was therefore reached without any meaningful analysis. *Id.*

¶ 43    We therefore conclude that defendant has failed to demonstrate that his two convictions for aggravated kidnaping violate the first step of the one-act, one-crime analysis, as they were not based on precisely the same physical act. Moreover, we need not continue to consider the second step analysis in this case because of defendant's failure to make any argument as to that issue. Ill. S. Ct. R. Rule 341(h)(7) (eff. Oct.1, 2020) (Points not argued in appellate brief are forfeited). Even if we were to consider this issue, we note that "[s]ection 2–9 of the Criminal Code of 1961 defines a lesser-included offense as an offense established by proof of lesser facts or mental state, or both, than the charged offense." *Miller*, 238 Ill. 2d at 165-66 (citing 720 ILCS 5/2–9 (West 2004)). Here, the two offenses challenged by defendant are each aggravated kidnaping, and one count of aggravated kidnaping is, by definition, not a lesser included offenses of another count of aggravated kidnaping based on a separate act.

¶ 44    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 45    Affirmed.